1   Keith Beauchamp (012434)
2   Shelley Tolman (030945)
    **COPPERSMITH BROCKELMAN PLC**
3   2800 North Central Avenue, Suite 1900
    Phoenix, Arizona  85004
4   T:  (602) 381-5490
    F:  (602) 224-6020
5   kbeauchamp@cblawyers.com
6   stolman@cblawyers.com

7   Jeffrey S. Gleason (admitted *pro hac vice*)
8   Jamie R. Kurtz (admitted *pro hac vice*)
    Nathaniel J. Moore (admitted *pro hac vice*)
9   Eric B. Boettcher (admitted *pro hac vice*)
    **ROBINS KAPLAN LLP**
10  2800 LaSalle Ave, Suite 2800
11  Minneapolis, MN 55402
    T: (612) 349-8500
12  F: (612) 339-4181
    jgleason@robinskaplan.com
13  jkurtz@robinskaplan.com
    nmoore@robinskaplan.com
14  eboettcher@robinskaplan.com
15
16  *Attorneys for Defendants/Counterclaimants*

17
                **UNITED STATES DISTRICT COURT**
18
                    **DISTRICT OF ARIZONA**
19

20  Advanced Reimbursement Solutions, LLC;      No. CV-19-05395-PHX-DLR
    and Patients 1-513,
21                                              **DEFENDANTS' ANSWER**
22              Plaintiffs,                     **AND COUNTERCLAIMS**

23  v.

24  The Aetna Life Insurance Company; Aetna
    Inc.; Aetna Health Inc.; and Does 1-50,
25
26              Defendants/Counterclaimants.

27

28

{00480966.2 }

*ROBINS KAPLAN LLP*
*ATTORNEYS AT LAW*
*MINNEAPOLIS*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1  The Aetna Life Insurance Company; and
2  Aetna Inc.,

3              Counterclaimants,

4  v.

5  Advanced Reimbursement Solutions, LLC;
   North Phoenix OTC, LLC; NorthView Pain
6  Treatment Center, PLLC; West Valley OTC,
   LLC; Alliance Pain Solutions, LLC; Arizona
7  Pain Ventures, LLC; Valley Pain Centers,
   LLC; Metro OTC, LLC; Valley Pain Centers
8  of Arizona, LLC; AZ Pain Solutions, LLC;
   Lakeshore Interventional Treatment Center,
9  LLC; Arrowhead Outpatient Treatment
   Center, LLC; Avonhealth, LLC; Desert Ridge
10 Facility, LLC; Gilbert Facility Group, LLC;
   Mesa Outpatient Treatment Center, LLC;
11 North Valley Pain Center, PLLC; Phoenix
   Pain Treatment Centers, PLLC; Surprise
12 Facility Group, LLC; Tempe Outpatient
   Treatment Center, LLC; Valley Pain Centers
13 of Peoria, LLC; Pain Treatment Center of
   Tempe, PLLC; Doctors Outpatient Surgery
14 Center, LLC; AZ Surgical Center, LLC;
   Tempe Interventional Treatment Center,
15 LLC; Valley Pain Intervention Center, LLC;
   and Uptown Facility, LLC,
16

17             Counterdefendants.

18

19         Defendants The Aetna Life Insurance Company, Aetna Inc., Aetna Health Inc., and

20 Does 1-50 (collectively, "Aetna"), by their undersigned counsel, answer the Complaint filed

21 by Advanced Reimbursement Solutions, LLC ("ARS"), and Patients 1-513 (the

22 "Members") (collectively, ARS and the Members are "Plaintiffs") as stated below.

23         Except for those matters specifically admitted, each and every allegation in the

24 Complaint is denied.

25         Aetna and the Plaintiffs have spoken on multiple occasions about the Plaintiffs'

26 failure to provide information about the Members and claims at issue in the Complaint.

27 Despite Aetna's requests, the Plaintiffs have not provided additional information.

28 Therefore, Aetna has undertaken, in good faith, to respond as thoroughly to the Plaintiffs'

Complaint as is reasonably possible given the limited information provided by Plaintiffs to date, particularly given the multitude of allegations that, to provide a substantive response, would require Aetna to be able to identify each of the 513 Members and claims at issue.

Moreover, the Complaint purports to assert claims on behalf of 513 Aetna members. (*See* Dkt. 1 at ¶ 1-2), who allegedly received treatment at more than 20 different Outpatient Treatment Centers ("OTC"), and who are likely participants in hundreds of different health plans. The allegations in the Complaint allege that the operative facts are substantially the same for each of the 513 Members (*see*, *e.g.*, *id*. at ¶¶ 25-39), but Aetna cannot evaluate the truth or falsity of these allegations as to each of the 513 Members without reviewing the claims information, which would require the Plaintiffs to provide information sufficient to identify the 513 Members and the claims at issue. Put differently, although many of the allegations in the Complaint are singular (*e.g.*, "Plaintiffs took all steps necessary under the Patients' respective insurance plans to appeal Aetna's denial of benefits," *see* Dkt. 1, ¶ 29), Aetna is unable to respond without first: (i) having sufficient information to identify each of the 513 Members; (ii) identifying the claims purportedly submitted on behalf of each of the 513 Members; and (iii) evaluating the records of the 513 Members' purported appeals.

**I.**

**SUMMARY OF ALLEGATIONS**

1. Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 1 of the Complaint. Aetna specifically denies that ARS has the authority to file suit in a representative capacity for the Members.

2. Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 2 of the Complaint.

3. Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 3 of the Complaint.

4. Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 4 of the Complaint.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

5.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 5 of the Complaint.

6.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 6 of the Complaint.

7.     Paragraph 7 of the Complaint states a legal conclusion, to which no response is required.  To the extent a response is required, Aetna denies the allegations in Paragraph 7 of the Complaint.

## II.

## JURISDICTION AND VENUE

8.     Aetna admits that, to the extent any of the Members' plans are governed by ERISA, the Court has subject matter jurisdiction over the Plaintiffs' ERISA claim (*i.e.*, those brought under 29 U.S.C. § 1132(a)(1)(b)) pursuant to U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).  Aetna further admits that, to the extent that any of the Members' plans are governed by ERISA, the Court has supplemental jurisdiction over the Plaintiffs' state law claims (breach of contract and unjust enrichment) pursuant to 28 U.S.C. § 1367.  Aetna denies that ARS has standing to pursue ERISA claims on behalf of Aetna's members.  Aetna lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 8 of the Complaint.

9.     Aetna admits that this Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b); Aetna denies the remaining allegations in Paragraph 9 of the Complaint.

## III.

## THE PARTIES

### Plaintiffs

### Advanced Reimbursement Solutions

10.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 10 of the Complaint.

{00480966.2 }

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

Patient Plaintiffs

11.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 11 of the Complaint.

**Standing**

12.     Paragraph 12 of the Complaint states a legal conclusion, to which no response is required.  To the extent that a response is required, Aetna denies the allegations in Paragraph 12 of the Complaint, and further specifically denies that ARS has the authority to sue in a representative capacity for the Members.

13.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 13 of the Complaint.  Aetna further specifically denies that ARS has the authority to sue in a representative capacity for the Members.

14.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 14 of the Complaint.

15.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 15 of the Complaint.

16.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 16 of the Complaint, except that Aetna specifically denies that ARS has the authority to sue in a representative capacity for the Members.

**A.     The Aetna Defendants**

17.     Aetna denies that any of the named Aetna entities are incorporated in Arizona or have a principal place of business in Arizona.  Aetna admits that it is licensed to sell insurance in Arizona and that Aetna has beneficiaries, members, or insured of plans underwritten, administered, or sold by Aetna that reside in Arizona and received treatment at the OTCs.

**B.     Other Payors**

18.     Aetna Life Insurance Company admits that it serves as a claims administrator for other self-funded plan sponsors, including, local employers.  Aetna admits that, in serving as a claims administrator for these other "payors," depending on

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

Aetna's relationship to the particular other payor, Aetna may: (a) authorize the provision of services to the other payors' members; (b) receive bills from providers; (c) price bills from providers; (d) process and administer bills from providers and appeals; (e) approve or deny bills from providers; (f) issue remittance advises and explanations of benefits; (g) communicate with providers and members regarding bills and services; and (h) issue payment for services.  Aetna lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 18 of the Complaint.

19.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 19 of the Complaint.

20.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 20 of the Complaint.

21.     Paragraph 21 of the Complaint states legal conclusions, to which no response is required.  To the extent a response is required, Aetna denies the allegations in Paragraph 21 of the Complaint.

**C.     The Treatment Centers**

22.     Aetna admits the allegations in Paragraph 22 of the Complaint.

23.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 23 of the Complaint.

**D.     DOE Defendants**

24.     Aetna denies the allegations in Paragraph 24 of the Complaint.

**IV.**

**ALLEGATIONS COMMON TO ALL CLAIMS**

25.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 25 of the Complaint.

26.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 26 of the Complaint.

27.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 27 of the Complaint.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

28.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 28 of the Complaint.

29.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 29 of the Complaint.

30.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 30 of the Complaint.

31.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 31 of the Complaint.

32.     Aetna denies the allegations of Paragraph 32 of the Complaint.

33.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 33 of the Complaint.

34.     Paragraph 34 of the Complaint states a legal conclusion, to which no response is required.  To the extent a response is required, Aetna admits that Ariz. Admin. Code R9-10-101(149) defines "outpatient treatment center" to mean "a class of health care institution without inpatient beds that provides physical health services or behavioral health services for the diagnosis and treatment of patients," and denies the remaining allegations in Paragraph 34, and denies the remaining allegations in Paragraph 34 of the Complaint.

35.     Paragraph 35 of the Complaint states a legal conclusion, to which no response is required.  To the extent a response is required, Aetna admits that Ariz. Admin. Code R9-10-101 defines "physical health services" to mean "medical services, nursing services, health-related services, or ancillary services provided to an individual to address the individual's medical condition," and further admits that outpatient treatment centers are authorized under Arizona law to provide "physical health services."  Aetna lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 35 of the Complaint.

36.     Paragraph 36 of the Complaint states a legal conclusion, to which no response is required.  To the extent a response is required, Aetna admits that A.R.S. § 36-401(A)(30) defines "medical services" as "services that pertain to medical care and that are performed

{00480966.2 }

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

at the direction of a physician on behalf of patients by physicians, dentists, nurses, and other professional and technical personnel," Aetna further admits that Ariz. Admin. Code R9-10-101 defines "treatment" as a "procedure or method to cure, improve, or palliate an individual's medical condition or behavioral health issue," and Aetna denies the remaining allegations in Paragraph 36 of the Complaint.

37.     Paragraph 37 of the Complaint states a legal conclusion, to which no response is required.  To the extent a response is required, Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 37 of the Complaint.

38.     Paragraph 38 of the Complaint states multiple legal conclusions, to which no response is required.  To the extent a response is required, Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegation that "no other health insurer has contended that the OTCs are not licensed to provide the same treatments at issue here to their members," and that "Aetna itself has paid for such services when rendered by the OTCs in the past."  Aetna denies the remaining allegations in Paragraph 38.

39.     Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 39 of the Complaint.

## V.

## ERISA CLAIMS

40.     Aetna admits the allegations in Paragraph 40 of the Complaint.

41.     Aetna lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 41 that Aetna is the ERISA plan administrator and ERISA fiduciary for the ERISA claims at issue in the Complaint.  The remainder of Paragraph 41 states a legal conclusion, to which no response is required.  To the extent that a response is required, Aetna denies the remaining allegations in Paragraph 41 of the Complaint.

42.     Aetna admits that it contracts with certain self-insured ERISA plans to perform administrative responsibilities, including: (a) certifying or authorizing providers'

{00480966.2 }

provision of services to members; (b) receiving provider's claims; (c) pricing provider's claims; (d) processing and administering claims and appeals; (e) approving or denying claims; (f) issuing remittance advices and explanations of benefits; (g) communicating with providers and members regarding claims and services; and (h) issuing payment.  Aetna lacks knowledge or information sufficient to form a belief about whether it performed administrative or other responsibilities for the self-insured ERISA plans at issue in this lawsuit, and denies the remaining allegations in Paragraph 42 of the Complaint.

43.     Paragraph 43 of the Complaint states legal conclusions, to which no response is required.  To the extent a response is required, Aetna denies the allegations in Paragraph 43 of the Complaint.

44.     Aetna denies the allegations of Paragraph 44 of the Complaint.

45.     Paragraph 45 of the Complaint states legal conclusions, to which no response is required.  To the extent a response is required, Aetna denies the allegations in Paragraph 45 of the Complaint.

46.     Aetna denies the allegations of Paragraph 46 of the Complaint.

47.     Paragraph 47 of the Complaint states a legal conclusion, to which no response is required.  To the extent a response is required, Aetna denies the allegations in Paragraph 47 of the Complaint.

48.     Aetna lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 48 that each of the Patients assigned their rights to benefits under their respective insurance plans to ARS, that each of the Patients also appointed ARS as their authorized representative to act on their behalf, or that each of the Patients granted ARS a specific power of attorney.  Aetna denies the remaining allegations in Paragraph 48 of the Complaint, and specifically denies that the powers of attorney are valid and effective under Arizona law, that the assignments of benefits to ARS are valid and effective under Arizona law, that the Patient's purported appointment of ARS as an authorized representative allows ARS to bring suit on behalf of the Patients, and that ARS has the authority to file suit in a representative capacity for the Members.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

49.    Aetna lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 49 of the Complaint.

50.    Aetna denies the allegations in Paragraph 50 of the Complaint.

51.    Paragraph 51 of the Complaint states legal conclusions, to which no response is required.   To the extent that a response is required, Aetna denies the allegations in Paragraph 51 of the Complaint.

**COUNT ONE**

**(Enforcement Under 29 U.S.C. § 1132(a)(1)(B)**

**For Failure to Pay ERISA Plan Benefits)**

(All Plaintiffs Against Aetna and DOES 1 Through 50)

52.    Aetna incorporates by reference each of its responses set forth above as if fully set forth herein.   For purposes of Count One, Aetna specifically denies that the purported powers of attorney are valid and effective under Arizona law, that the purported assignments of benefits to ARS are valid and effective under Arizona law, that the Patient's purported appointment of ARS as an authorized representative allows ARS to bring suit on behalf of the Patients, and that ARS has the authority to file suit in a representative capacity for the Members.

53.    Aetna denies the allegations in Paragraph 53 of the Complaint, and notes that the OTCs may not allege any claim for relief because the OTCs are not Plaintiffs.

54.    Aetna denies the allegations in Paragraph 54 of the Complaint.

55.    Aetna denies the allegations in Paragraph 55 of the Complaint.

56.    Aetna denies the allegations in Paragraph 56 of the Complaint.

**COUNT TWO**

**(Breach of Contract)**

(By Patients and ARS Against Aetna and DOES 1 Through 50)

57.    Aetna incorporates by reference each of its responses set forth above as if fully set forth herein.   For purposes of Count Two, Aetna specifically denies that the purported powers of attorney are valid and effective under Arizona law, that the purported

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

assignments of benefits to ARS are valid and effective under Arizona law, that the Patient's purported appointment of ARS as an authorized representative allows ARS to bring suit on behalf of the Patients, and that ARS has the authority to file suit in a representative capacity for the Members.

58.   Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 58 of the Complaint.

59.   Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 59 of the Complaint.

60.   Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 60 of the Complaint.

61.   Aetna denies the allegations in Paragraph 61 of the Complaint.

62.   Aetna denies the allegations in Paragraph 62 of the Complaint.

63.   Aetna denies the allegations in Paragraph 63 of the Complaint.

## COUNT THREE

### (For Unjust Enrichment)

(By Patients and ARS Against Aetna and DOES 1 Through 50)

64.   Aetna incorporates by reference each of its responses set forth above as if fully set forth herein.  For purposes of Count Three, Aetna specifically denies that the purported powers of attorney are valid and effective under Arizona law, that the purported assignments of benefits to ARS are valid and effective under Arizona law, that the Patient's purported appointment of ARS as an authorized representative allows ARS to bring suit on behalf of the Patients, and that ARS has the authority to file suit in a representative capacity for the Members.

65.   Aetna lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 65 of the Complaint.

66.   Aetna denies the allegations in Paragraph 66 of the Complaint.

67.   Aetna denies the allegations in Paragraph 67 of the Complaint, and note that the OTCs may not allege any claim for relief because the OTCs are not Plaintiffs.

68.     Aetna denies the allegations in Paragraph 68 of the Complaint.

69.     Aetna denies the allegations in Paragraph 69 of the Complaint.

70.     Aetna denies that Plaintiffs are entitled to the relief sought in the WHEREFORE clause following Paragraph 69.

## DEFENSES TO COMPLAINT

71.     The Complaint, and each and every claim therein, fails to state facts sufficient to constitute a cause of action upon which relief may be granted against Aetna.

72.     The Plaintiffs lack standing, in whole or in part, to assert the claims herein.

73.     ARS does not have authority to file suit in a representative capacity on behalf of the Members.

74.     The Plaintiffs' claims are barred, in whole or in part, due to a failure to exhaust administrative and/or contractual remedies.

75.     The purported assignments are invalid, including for lack or failure of consideration and/or because they are barred by anti-assignment provisions in the applicable health plans.

76.     The powers of attorney that ARS alleges give it the authority to sue on the Members' behalf are invalid under Arizona law.

77.     The powers of attorney that ARS alleges give it the authority to sue on the Members' behalf do not convey that authority to ARS.

78.     The Members' claims are barred for failure to identify the Members as Plaintiffs.

79.     ARS and the OTCs may not bill as a facility, or using facility fees, for services rendered at an outpatient treatment center.

80.     Under Aetna's publicly available policy, the OTCs' lacked appropriate licensing to be reimbursed by Aetna for facility fees or any related surgical care charges (*e.g.*, pharmaceuticals, surgical supplies, operating room charges), including but not limited to because the OTCs were not licensed as ambulatory surgical centers or a comparable title used in Arizona to describe a freestanding facility, other than a physician's office, where

surgical and diagnostic services are provided on an ambulatory basis. This policy was available to ARS and the OTCs on Aetna's website. http://aetnet.aetna.com/medOps/contentMgtAssets/documents/Policy_Support/Payment_P olicies/S004_Surgical_Procedures.pdf. In addition to being publicly available, Aetna advised the OTC's in writing as to the existence of this policy and that it rendered facility fees being billed by the OTCs not payable.

81. The Plaintiffs' claims are barred, in whole or in part, to the extent that Aetna served as an administrator of self-funded ERISA plans, but Aetna is not currently providing administrative services to such plans.

82. Aetna is not the proper party to the extent that it did not issue, insure, administer, or sponsor the underlying health plans.

83. The Plaintiffs' contract claim is barred because the Plaintiffs have not identified any contracts that Aetna allegedly breached, nor identified the Aetna-affiliated entity/ies that were parties to the contracts.

84. The Plaintiffs' claims are barred, in whole or in part, by the tortious, fraudulent, and illegal conduct of ARS, the OTCs, and their conspirators.

85. The Plaintiffs' claims are barred, in whole or in part, by illegality and/or the doctrine of unclean hands.

86. Platelet-rich plasma, bone marrow, and certain other types of injections are not covered by Aetna for purposes of pain management, and policies to that effect were publicly available throughout the relevant period. To circumvent this prohibition, ARS and the OTCs administered PRP injections and billed for services incidental to the PRP injections (*e.g.*, facility fees and technical components of the PRP injection) that were not payable.

87. The Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver, laches, and/or estoppel.

88. To the extent that the Plaintiffs have suffered any damages, which Aetna denies, Aetna is entitled to equitable recoupment or a setoff against any such damages equal

to amounts the Plaintiffs or OTCs owe Aetna, including the damages suffered by Aetna as a result of misconduct by ARS and the OTCs, as set forth in the counterclaims filed herein, or otherwise according to the terms of the underlying health plans and policies.

89.     The Plaintiffs' claims are barred, in whole or in part, to the extent that plan documents or other contracts underlying the Plaintiffs' claims contain provisions limiting the time during which benefit determinations or payments may be disputed and/or notice must be given, or otherwise provide that the claims are not payable.

90.     The Plaintiffs' claims are barred, in whole or in part, to the extent that they seek to recover amounts for services allegedly rendered which are unreasonable, including but not limited to circumstances where: (a) the Plaintiffs seek reimbursement for services not actually performed, or for services different than those billed; (b) the Plaintiffs seek payment for claims where incorrect coding (*e.g.*, revenue codes, place of service codes, CPT codes, HCPCS codes) were used; (c) Plaintiffs seek reimbursement for services claims tainted by improper kickbacks, remuneration, waived or eliminated cost-sharing obligations, or other improper inducements; (d) the Plaintiffs seek reimbursement for amounts that fail to take into account co-payment, co-insurance, and/or deductibles that must be recovered as a matter of law and/or industry practice; (e) the Plaintiffs seek reimbursement for services billed at egregious or non-customary rates; and (f) any other terms, conditions, exclusions, or limitations of the underlying health plans that render the claims at issue not payable.

91.     The Plaintiffs' claims are barred, in whole or in part, by failure to mitigate. Specifically, Aetna sent written notice to the OTCs that it would not reimburse the OTCs for facility fees.  Despite this notice, the OTCs continued to provide services to Aetna members and bill Aetna for facility fees.

92.     The Plaintiffs' demands for relief set forth in the Complaint are barred, in whole or in part, to the extent the Plaintiffs are pursuing claims they do not possess the legal right to pursue.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

93.     The Plaintiffs are barred from any recovery against Aetna because Aetna's conduct was reasonable, justified, privileges, excused, and/or not arbitrator and capricious.

94.     The Plaintiffs have not suffered any damages.

95.     To the extent damages or harms suffered by the OTCs form a basis for the Plaintiffs' claims, they are barred because the OTCs are not Plaintiffs.

96.     The Plaintiffs' claims are barred, in whole or in part, because the Plaintiffs fail to identify the terms, patient, policies, or plan of any specific ERISA-governed plans at issue.

97.     The Plaintiffs' claims are barred, in whole or in part, to the extent that Aetna's conduct was authorized by applicable law.

98.     The Plaintiffs claims are barred, in whole or in part, to the extent that Aetna substantially complied with their obligations under applicable employer-sponsored healthcare benefit plans.

99.     Every act or statement done or made by Aetna and its agents, officers, and employees with reference to the Plaintiffs or OTCs was a good faith assertion of Aetna's rights and, therefore, was privileged and justified.

100.    Aetna reserves the right to assert, and hereby gives notice that they intend to rely upon, any other defense that may become available or appear during these proceedings or otherwise in this case and hereby reserve the right to amend its Answer to assert any such defense.

101.    The Members' claims are barred by their own breaches of contract or failure to perform the contract.

102.    The Plaintiffs' claims are barred by estoppel.

103.    The Plaintiffs' claims are barred by public policy.

104.    The Plaintiffs' claims are barred because the Plaintiffs would be unjustly enriched if allowed to recover for the claims alleged in the Complaint.

105.    The Plaintiffs are improperly joined in this action.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

106.   The Plaintiffs' claims are barred by the terms of the relevant policies and plans.

## **COUNTERCLAIMS**

### **(Jury Trial Demanded on All Matters so Triable)**

107.   For its counterclaims against Advanced Reimbursement Solutions, LLC ("ARS"); North Phoenix OTC, LLC; NorthView Pain Treatment Center, PLLC; West Valley OTC, LLC; Alliance Pain Solutions, LLC; Arizona Pain Ventures, LLC; Valley Pain Centers, LLC; Metro OTC, LLC; Valley Pain Centers of Arizona, LLC; AZ Pain Solutions, LLC; Lakeshore Interventional Treatment Center, LLC; Arrowhead Outpatient Treatment Center, LLC; Avonhealth, LLC; Desert Ridge Facility, LLC; Gilbert Facility Group, LLC; Mesa Outpatient Treatment Center, LLC; North Valley Pain Center, PLLC; Phoenix Pain Treatment Centers, PLLC; Surprise Facility Group, LLC; Tempe Outpatient Treatment Center, LLC; Valley Pain Centers of Peoria, LLC; Pain Treatment Center of Tempe, PLLC; Doctors Outpatient Surgery Center, LLC; AZ Surgical Center, LLC; Tempe Interventional Treatment Center, LLC; Valley Pain Intervention Center, LLC; and Uptown Facility, LLC (collectively, the "Counterclaim Defendants"[1]), Counterclaim-Plaintiffs Aetna, Inc. and Aetna Life Insurance Company (collectively, for purposes of the counterclaims, "Aetna"), by its undersigned counsel, state and allege as follows:

---

[1] As used herein, "OTCs" refers to Counterclaim-Defendants North Phoenix OTC, LLC; NorthView Pain Treatment Center, PLLC; West Valley OTC, LLC; Alliance Pain Solutions, LLC; Arizona Pain Ventures, LLC; Valley Pain Centers, LLC; Metro OTC, LLC; Valley Pain Centers of Arizona, LLC; AZ Pain Solutions, LLC; Lakeshore Interventional Treatment Center, LLC; Arrowhead Outpatient Treatment Center, LLC; Avonhealth, LLC; Desert Ridge Facility, LLC; Gilbert Facility Group, LLC; Mesa Outpatient Treatment Center, LLC; North Valley Pain Center, PLLC; Phoenix Pain Treatment Centers, PLLC; Surprise Facility Group, LLC; Tempe Outpatient Treatment Center, LLC; Valley Pain Centers of Peoria, LLC; Pain Treatment Center of Tempe, PLLC; Doctors Outpatient Surgery Center, LLC; AZ Surgical Center, LLC; Tempe Interventional Treatment Center, LLC; Valley Pain Intervention Center, LLC; and Uptown Facility, LLC.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

## NATURE OF THE COUNTERCLAIMS

108.   Since at least June of 2015, ARS and the OTCs[2] engaged in a fraudulent billing scheme intended to undermine the controls that Aetna has on abusive pricing by out-of-network healthcare providers.  The scheme caused millions of dollars of losses to Aetna and its self-funded plan sponsors.   The multifaceted scheme relied upon the OTCs masquerading as surgical facilities, billing for services in a way that often disguised the services actually rendered, and systematically waiving each members' financial responsibility.

109.   A central component of the scheme relates to fraudulent billing of facility fees.  Over the last four years, ARS and the OTCs improperly represented that the OTCs were ambulatory surgery centers and entitled to payment of outrageously high facility fees—sometimes exceeding $30,000 per visit—that were billed in addition to the professional fees billed by the medical professionals actually performing the services.  The result was that Aetna was often charged more than $40,000 for a basic pain management injection.

110.   Despite the representations made by ARS and the OTCs, the OTCs were not licensed surgery centers, were not entitled to bill for or receive facility fees under Aetna policy, and do not have the characteristics that warrant payment of facility fees, the purpose of which is to cover the overhead of certain types of facilities.

111.   In addition to the fraudulent billing of facility fees, ARS and the OTCs often submitted claims for services that were never actually rendered or that misrepresented the services rendered.  For example, ARS and the OTCs billed for anesthesia services when no anesthesia was actually administered to the patient.  Similarly, ARS and the OTCs took

---

[2] While Aetna has only named certain OTCs as Counterclaim Defendants, it is aware that ARS has engaged in a similar scheme with other Outpatient Treatment Centers that are not currently named as Counterclaim-Defendants.  Aetna may seek leave to add additional Outpatient Treatment Centers as Counterclaim-Defendants at a later time.  However, to be clear, through this Counterclaim, as it is currently stands, Aetna is seeking recovery of all damages caused by ARS whether in concert with the named OTCs or unnamed Outpatient Treatment Centers.

affirmative steps to misrepresent the nature of the services being provided in order to obtain reimbursements for services that are experimental and investigation procedures which have no proven efficacy in pain management and which are explicitly excluded from coverage under Aetna's policies.  Instead of billing for the services rendered using the billing codes specifying those services, ARS and the OTCs used billing codes that hid the true nature of the service to obtain payment for non-covered services, for example billing for a general injection when a non-covered platelet-rich plasma injection was provided.

112.    The exorbitant prices charged by ARS and the OTCs should have deterred patients and referring providers from receiving treatment at the OTCs.  ARS and the OTCs addressed that possibility by systematically and tortiously interfering with Aetna's contracts with members and in-network providers in ways that undermined the key controls in place on prices charged by out-of-network providers like the OTCs that help manage the cost of healthcare.

113.    Specifically, one of the primary checks on abusive pricing by out-of-network providers is Aetna's members' cost-sharing obligations (*e.g.*, deductibles and coinsurance), whereby the members are responsible for a portion of the cost of their care, at least until the members hit any applicable out-of-pocket maximums.  These cost-sharing obligations incentivize both Aetna members and their referring providers to find cost-efficient care, particularly where the services being provided are available from many providers, as was the case with the services rendered by the OTCs.

114.    To avoid this result, and to ensure that patients would be willing to receive services from the OTCs in spite of their extremely high prices and out-of-network status, ARS and the OTCs waived substantially all of the Aetna members' cost-sharing obligations for services provided by the OTCs, while at the same time misleading the members about the ultimate cost impact and thereby circumventing the design of Aetna's member benefit plans and interfering with Aetna's contracts with its members, which typically require the payment of cost-sharing.

115.   In addition, upon information and belief, ARS, the OTCs, and one or more ARS-affiliated entities also interfered with Aetna's network contracts with other providers, encouraging those in-network providers to refer Aetna members to the OTCs even though those providers' network contracts with Aetna restricted referrals to out-of-network providers except in limited circumstances inapplicable here.

116.   As a result of the conduct of the OTCs and ARS, Aetna has been damaged in an amount to be determined a trial.

## JURISDICTION AND VENUE

117.   The Court has subject matter jurisdiction over Aetna's counterclaims under 28 U.S.C. § 1367(a) because they are so related to the Plaintiffs' claims that they form part of the same case or controversy under Article III of the United States Constitution.

118.   The Court also has subject matter jurisdiction over Aetna's counterclaims under 28 U.S.C. § 1331 because they arise under the laws of the United States.  Specifically, the action seeks to enforce rights under ERISA pursuant to 29 U.S.C. § 1132(a)(3), and the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because the state law claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

119.   The Court also has subject matter jurisdiction over Aetna's counterclaims under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

120.   This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this judicial district; namely, the OTCs provided the services at issue to Aetna members in this district, and ARS billed Aetna for the services purportedly performed by the OTCs from this district.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

## THE PARTIES

121.   Counterclaim Plaintiff Aetna, Inc. is a Pennsylvania corporation with a principal place of business in Hartford, Connecticut.

122.   Counterclaim Plaintiff Aetna Life Insurance Company, Inc. is a Connecticut corporation with a principal place of business in Hartford, Connecticut.

123.   Counterclaim Defendant Advanced Reimbursement Solutions, LLC is a Delaware limited liability company with a principal address of 19820 N. 7th Ave, Suite 230-C, Phoenix, Arizona 85027.  The sole member of ARS is Pantheon Global Holdings, LLC, itself a Delaware limited liability company with three members: Christopher E. Maxon Maldonado, Gregory B. Maxon Maldonado, and Brandon J. Maxon Maldonado, all of whom are domiciled in Arizona.

124.   Counterclaim Defendant North Phoenix OTC, LLC is an Arizona limited liability company with a principal address of 3329 E. Bell Road, Suite A1, Phoenix, Arizona 85032.  The sole member of North Phoenix OTC, LLC is Integrated Health Management, Inc., an Arizona corporation with a principal place of business in Arizona.[3]

125.   Counterclaim Defendant NorthView Pain Treatment Center, PLLC is an Arizona professional limited liability company with a principal address of 15650 N. Black Canyon Highway, Unit B-121, Phoenix, Arizona 85033.  The managers of NorthView Pain Treatment Center, PLLC are Kevin Kerchansky, Eric Church, and John Baca, all of whom are domiciled in Arizona.

126.   Counterclaim Defendant West Valley OTC, LLC is an Arizona limited liability company with a principal address of 12409 W. Indian School, Suite B210, Avondale, Arizona 85392.  The members of West Valley OTC, LLC are Kristy Morgan, domiciled in Arizona, and TKMH, LLC, an Arizona limited liability company with two members—the Rutgers Holdings, LLC and TA Morgan Holdings, LLC—both of which are

---

[3] Pierce and Erin Waychoff are the managers of North Phoenix OTC, LLC, and are the Directors and officers of Integrated Health Management, Inc., the sole shareholder of which is the Waychoff Family Revocable Trust.

{00480966.2 }

Arizona limited liability companies with a sole member, the Morgan Family Trust, the trustee for which is, upon information and belief, domiciled in Arizona.[4]

127.    Counterclaim Defendant Alliance Pain Solutions, LLC is an Arizona limited liability company with a principal address of 2330 N. 75th Ave, Suite 104, Phoenix, Arizona 85035.  The managers of Alliance Pain Solutions, LLC are Michael J. Castrichini, Nikki Vaughan, and Don Baca, all of whom are domiciled in Arizona.

128.    Counterclaim Defendant Arizona Pain Ventures, LLC is an Arizona limited liability company with a principal address of 1450 W. Guadalupe Road, Suite 120, Gilbert, Arizona 85233.  The two members of Arizona Pain Ventures are Chiro Corp Management, PLLC (an Arizona limited liability company with three members: (1) Radma Rahiminejad, domiciled in Arizona; (2) Yasmin Rahiminejad, domiciled in Arizona; and (3) the Rahimi Family Trust, the trustee for which is, upon information and belief, domiciled in Arizona) and BlueWaves Capital Group, LLC (an Arizona limited liability company with a single member, the Vogel Family Trust, the trustee for which is, upon information and belief, domiciled in Arizona).

129.    Counterclaim Defendant Valley Pain Centers, LLC is an Arizona limited liability company with a principal address of 4045 E. Bell Road #147, Phoenix, Arizona 85032.  The members of Valley Pain Centers, LLC are Jeffrey A. Lynn and Roger P. Walker, both of whom are domiciled in Arizona.

130.    Counterclaim Defendant Metro OTC, LLC is an Arizona limited liability company with a principal address of 10046 N. Metro Parkway #115, Phoenix, Arizona 85051.  The members of Metro OTC, LLC are Genesis Pain Management, LLC and VWHCMetro, LLC.  Genesis Pain Management LLC is an Arizona limited liability company with a sole member, Genesis Medical Management, LLC, which in turn is an Arizona limited liability company with four members: (1) The Sieffert Family Trust, for which the trustee(s) are, upon information and belief, domiciled in Arizona; (2) Monzon

---

[4] The managers of West Valley OTC are Thomas and Kristy Morgan.

{00480966.2 }

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

Investments, Inc., an Arizona corporation with a principal place of business in Arizona; (3) Manohara Investments, LLC, a California limited liability company managed by Anand Manohara, domiciled in California; and (4) Acharya Ventures, LLC, a California limited liability managed by Ganesh Acharya, domiciled in California.[5]

131.    Counterclaim Defendant Valley Pain Centers of Arizona, LLC is an Arizona limited liability company with a principal address of 4045 E. Bell Road, Suite 147, Phoenix, Arizona 85032.  The members of Valley Pain Centers of Arizona, LLC are Jeffrey Lynn and Roger Walker, both of whom are domiciled in Arizona.

132.    Counterclaim Defendant AZ Pain Solutions, LLC is an Arizona limited liability company with, upon information and belief, a sole member, AZ Medical Holdings, LLC, a Delaware limited liability company for which, upon information and belief, the members are domiciled in Arizona.

133.    Counterclaim Defendant Lakeshore Interventional Treatment Center, LLC is an Arizona limited liability company with a principal address of 4765 S. Lakeshore Drive, Tempe, Arizona 85285.  The sole member of Lakeshore Interventional Treatment Center, LLC is Lakeshore Center Holdings, LLC, itself an Arizona limited liability company with a sole member, Phoenix United Management Associates, LLC, which in turn is managed by JS White Consultants, LLC, a Wyoming limited liability company.

134.    Counterclaim Defendant Arrowhead Outpatient Treatment Center, LLC is an Arizona limited liability company with a principal address of 6320 W. Union Hills Drive, Suite 1400B, Glendale, Arizona 85308.  Arrowhead Outpatient Treatment Center, LLC has a single member, Brandy Joint Holdings, LLC, which itself has three members: (1) RJV Holdings, LLC, an Arizona limited liability company for which Ronald Vigneau is the sole member, domiciled in Arizona; (2) SAV Holdings, LLC, an Arizona limited liability company for which the Vigneau Family Trust is the sole member, for whom the trustee is, upon information and belief, domiciled in Arizona; and (3) JJV Holdings, LLC, an Arizona

---

[5] The managers of Metro OTC, LLC are Challen Waychoff and Ganesh Acharya.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

limited liability company for which Joseph Vigneau is the sole member, domiciled in Arizona.

135.    Counterclaim Defendant Avonhealth, LLC is an Arizona limited liability company with a principal address of 12409 W. Indian School Road, Suite B210, Avondale, Arizona 85392.  The sole member of Avonhealth, LLC is TKMH, LLC, an Arizona limited liability company with two members—the Rutgers Holdings, LLC and TA Morgan Holdings, LLC—both of which are Arizona limited liability companies with a sole member, the Morgan Family Trust, the trustee for which is, upon information and belief, domiciled in Arizona.[6]

136.    Counterclaim Defendant Desert Ridge Facility, LLC is an Arizona limited liability company with a principal address of 21001 North Tatum Boulevard, Suite 78-1640, Phoenix, Arizona 85050.  The three members of Desert Ridge Facility, LLC are: (1) SD Ventures, LLC, the sole member of which is the Rahimi Family Trust, the trustee for which is, upon information and belief, domiciled in Arizona; (2) S&S Business Holdings, LLC, the sole member of which is the Rahimi Twins Trust, the trustee for which is, upon information and belief, domiciled in Arizona; and (3) 3Wood Management, LLC, the sole member of which is the Michael Cormier Revocable Living Trust, the trustee for which is, upon information and belief, domiciled in Arizona.

137.    Counterclaim Defendant Gilbert Facility Group, LLC is an Arizona limited liability company with a principal address of 3367 S. Mercy Road, Suite 203, Gilbert, Arizona 95297.  The members of Gilbert Facility Group, LLC are: (1) B2W, LLC, an Arizona limited liability company managed by Genesis Pain Management LLC (which has members who are domiciled in Arizona and California), Challen Waychoff (domiciled in Arizona), and JEB Ventures, LLC (the sole member in which is Joel E. Braun, M.D., PLLC, for which Joel E. Braun, domiciled in Arizona, is the sole member); and (2) VWHC Gilbert, LLC, which is not registered to do business in Arizona.

---

[6] The managers of Avonhealth, LLC are Thomas and Kristy Morgan.

138.    Counterclaim Defendant Mesa Outpatient Treatment Center, LLC is an Arizona limited liability company with a principal address at 4540 E. Baseline Road #105, Mesa, Arizona 85206.  The members of Mesa Outpatient Treatment Center, LLC are: (1) Encore Health and Wellness Solutions, LLC, the sole member of which is the Crist Family Trust, the trustee for which is, upon information and belief, domiciled in Arizona; and (2) Buckner Holdings, LLC, the sole member of which is the Buckner Family Trust, the trustee for which is, upon information and belief, domiciled in Arizona.

139.    Counterclaim Defendant North Valley Pain Center, PLLC is an Arizona limited liability company with a principal address of 15650 North Black Canyon Highway, Unit B-121, Phoenix, Arizona 85033.  The managers of North Valley Pain Center are Keith Bangart, DPM; Daniel Bangart, DPM; Jeff Thomas, DPM; and Steven Shane Moore, DPM; all of whom are domiciled in Arizona.

140.    Counterclaim Defendant Phoenix Pain Treatment Centers, PLLC is an Arizona professional limited liability company with a principal address of 9140 W. Thomas Road, Suite B106, Phoenix, Arizona 85037.  The sole member of Phoenix Pain Treatment Centers is Trever Penny, domiciled in Arizona.

141.    Counterclaim Defendant Surprise Facility Group, LLC is an Arizona limited liability company with a principal address of 16960 W. Bell Road, Suite 502, Surprise, Arizona 85374.  The sole member of Surprise Facility Group, LLC is VWHC Surprise, LLC, which is not registered to do business in Arizona.

142.    Counterclaim Defendant Tempe Outpatient Treatment Center, LLC is an Arizona limited liability company with a principal address of 1001 E. Warner Road #103, Tempe, Arizona 85284.  The sole member of Tempe Outpatient Treatment Center, LLC is Warner 103 Operating, LLC, which in turn has two members: (1) Buckner Holdings, LLC, the sole member of which is the Buckner Family Trust, the trustee for which is, upon information and belief, domiciled in Arizona; and (2) SAV Holdings, LLC, for which the Vigneau Family Trust is the sole member, for whom the trustee is, upon information and belief, domiciled in Arizona.

143.   Counterclaim Defendant Valley Pain Centers of Peoria, LLC is an Arizona limited liability company with a principal address of 9242 W. Union Hills Drive, Suite 100, Peoria, Arizona 85382.  The sole member of Valley Pain Centers of Peoria, LLC is Valley Pain Centers, LLC, which has two members, Jeffrey A. Lynn and Roger P. Walker, both domiciled in Arizona.

144.   Counterclaim Defendant Valley Pain Intervention Center, LLC is an Arizona limited liability company with a principal address of 2745 S. Alma School Road, Suite 3, Chandler, Arizona, 85286.  The members of Valley Pain Intervention Center, LLC are: (1) Braken Properties, Inc., an Arizona corporation with a principal place of business in Arizona; (2) Triad Consulting & Holdings, LLC, with two Arizona-domiciled members, John J. Baca and Carri B. Baca; and (3) Scarlet Begonias, LLC, managed by Kevin Kerchansky, domiciled in Arizona.

145.   Counterclaim Defendant Pain Treatment Center of Tempe, PLLC is an Arizona professional limited liability company with a principal address of 4515 S. McClintock Drive, Suite 114, Tempe, Arizona 85282.  The two members of Pain Treatment Center of Tempe, PLLC are: (1) Triad Consulting & Holdings, LLC, with two Arizona-domiciled members, John J. Baca and Carri B. Baca; and (2) Scarlet Begonias, LLC, managed by Kevin Kerchansky, domiciled in Arizona.

146.   Counterclaim Defendant Doctors Outpatient Surgery Center, LLC is an Arizona limited liability company with a principal address of 2155 E. Conference Drive #111, Tempe, AZ 85284.  The sole member of Doctors Outpatient Surgery Center, LLC is Longhorn Surgical Development, Inc., an Arizona corporation with a principal place of business in Arizona.

147.   Counterclaim Defendant AZ Surgical Center, LLC, d/b/a Central Arizona Surgical Center is an Arizona limited liability company with a principal address of 5133 N. Central Avenue, Suite 100, Phoenix, Arizona 85012.  The three members of AZ Surgical Center, LLC are: (1) Triad Consulting & Holdings, LLC, with two Arizona-domiciled members, John J. Baca and Carri B. Baca; (2) Scarlet Begonias, LLC, managed by Kevin

1    Kerchansky, domiciled in Arizona; and (3) MJCA Consulting, LLC, with two Arizona-

2    domiciled members, Christine Angela Castrichini and Michael J. Castrichini.

3        148.    Counterclaim Defendant Tempe Interventional Treatment Center, LLC is an

4    Arizona limited liability company with a principal address of 1001 E. Warner Road, #103,

5    Tempe, Arizona 85284.  The sole member of Tempe Interventional Treatment Center, LLC

6    is Warner 103 Operating, LLC, which in turn has two members: (1) Buckner Holdings,

7    LLC, the sole member of which is the Buckner Family Trust, the trustee for which is, upon

8    information and belief, domiciled in Arizona; and (2) SAV Holdings, LLC, for which the

9    Vigneau Family Trust is the sole member, for whom the trustee is, upon information and

10   belief, domiciled in Arizona.

11       149.    Counterclaim Defendant Uptown Facility, LLC is an Arizona limited liability

12   company with a principal address of 3724 N. 3rd Street, Suite 300, Phoenix, Arizona 85012.

13   The sole member of Uptown Facility, LLC is VWHC Uptown, LLC, which is not registered

14   to do business in Arizona.[7]

15   ## THE RELATIONSHIPS BETWEEN THE OTCS AND ARS

16       150.    The OTCs contracted with ARS to provide "out of network" claims billing

17   services on behalf of the OTCs.  As a result, at all times relevant hereto, ARS was

18   responsible for billing Aetna for services rendered by the OTCs to Aetna's members.

19       151.    Upon information and belief, ARS required the OTCs to simultaneously enter

20   into non-disclosure agreements.

21       152.    Upon information and belief, in exchange for its provision of "out of network"

22   claims billing services to the OTCs, the OTCs were contractually obligated to pay ARS at

23   least 17.5% of all claims reimbursements received from Aetna, *plus* additional fees where

24   other services were provided.  For example, where ARS was responsible for appealing

25   Aetna's initial claims determination, ARS was entitled a fee from the OTCs equal to 25%

26   of all amounts collected for claims billed and appealed by ARS.

27
28   [7] The managers of Uptown Facility, LLC are Genesis Pain Management, LLC; Ganesh
     Acharya; Mike Seifried; James Sieffert; and Challen Waychoff.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

153.   Ostensibly, working for what amounts to a contingency fee gave ARS enough motivation to deceive Aetna when billing out-of-network claims and to take steps to increase the number of claims it could bill for the OTCs on behalf of Aetna members.

## THE IMPACTED HEALTH BENEFIT PLANS

*Fully Insured and Self-Funded Plans*

154.   Aetna brings these counterclaims on its own behalf as the provider of fully-insured health plans through which individuals, employees, and employers pay Aetna premiums in exchange for Aetna agreeing to pay their healthcare claims using Aetna's money.  A portion of the claims at issue in this case are fully insured claims.  Thus, Aetna was fraudulently induced to pay its own funds to the OTCs (and indirectly, ARS) as part of the improper billing scheme.

155.   Aetna also brings these counterclaims as claims administrator for self-funded, employer-established health plans that retain Aetna as a third-party administrator to process employees' healthcare claims and pay those claims out of a pool of money comprised of funds contributed by employers and their employees.  For these self-funded plans, Aetna does not underwrite or insure the benefits being paid.  Rather, claims covered under self-funded health plans are paid directly by employers and employees using their own money.  Through Aetna's agreements with these self-funded plan sponsors, Aetna is authorized to bring this action to recover overpayments caused by OTC's and ARS's fraudulent and improper conduct.

156.   In its capacity as an insurer and claims administrator, Aetna processes over one million healthcare claims per workday, and is responsible for processing and administering hundreds of millions of healthcare claims per year.

157.   Aetna's plans function in accordance with insurance policies, contracts, and/or plan documents, which establish, among other things, the rights and responsibilities of the payor entities and of the individuals who have enrolled in the policies, contracts, and/or plans.  Aetna refers to its enrollees as its "members."

*Member Cost-Sharing Obligations*

158.   The terms of Aetna's member benefit plans set forth several requirements designed to impose reasonable limits on the cost of care.  For example, Aetna's members are required to pay a portion of the cost of the healthcare services they receive from providers.   These member payment responsibilities are referred to as "cost-sharing obligations," and generally consist of a few components.

159.   *First*, Aetna's plans generally require members to pay a deductible.   A deductible is a dollar amount a member must pay each calendar year for the healthcare services they receive before their insurance company begins to pay for certain health services.  Until a deductible is met, a member's plan benefits and the insurer's obligation to pay for healthcare services are generally not triggered.

160.   *Second*, assuming members have paid their deductibles, Aetna's plans generally also require members to pay coinsurance for the healthcare services they receive, until they meet any "out of pocket" maximum set forth in their respective plans. Coinsurance is the percentage of costs of a covered healthcare service that members pay (*e.g.*, 20% of the allowed amount) after paying their deductible.

161.   *Third*, Aetna's plans sometimes require members to pay modest, fixed dollar amounts called "copays" at the time they receive certain healthcare services after their deductible is paid.

162.   These member cost-sharing requirements provide structure to the insurance markets, help control the cost of healthcare, and serve as importance checks on fraud, waste, and abuse.  Because Aetna's members (not Aetna) control which healthcare services they receive, Aetna's plan requirements regarding member payment responsibilities ensure that members only enroll in coverage they are willing to pay for and remain sensitized to some portion of the cost of the healthcare services they receive from the providers they choose to patronize.  This results in more affordable healthcare for all Aetna members, as well as members of the public more broadly.

{00480966.2 }

163.   Conversely, where a provider waives or decides not to collect a deductible, coinsurance payments, or copays, the result may be that Aetna pays amounts it does not owe under the terms of its plans.

*The Design of Aetna's Benefit Plans*

164.   To control costs, Aetna enters into network contracts with healthcare providers (making the provider "participating" or "in-network").  The network contracts set the prices that Aetna will pay for services rendered by the in-network provider.  On the other hand, healthcare providers that have *not* contracted with Aetna (called "non-participating" or "out-of-network" providers), such the OTCs, have not agreed to a particular reimbursement for their services.  And unlike certain federal healthcare programs (*e.g.*, Medicare), which have fixed fees for particular services, there are no limits on the prices that out-of-network healthcare providers like the OTCs may *charge* when billing to commercial payors.  As a result, the prices charged by out-of-network providers are typically not constrained by contract or regulation.

165.   Not all Aetna plans cover non-emergency services rendered by out-of-network providers.  If out-of-network services are covered, Aetna members typically owe as coinsurance a higher percentage of the total amount billed by an out-of-network provider than they would owe if they had seen an in-network provider.

166.   For services billed by out-of-network providers, Aetna members are responsible for the difference between what the out-of-network provider bills Aetna and the amount allowed by Aetna.[8]  This is called balance billing.  Moreover, the amount balance-billed does not count toward Aetna members' out-of-pocket maximums, and some plans have separate out-of-network deductibles that are higher than the same members' in-network deductibles.

---

[8] Allowed amounts are often based on "reasonable," "usual and customary," or "prevailing charges" for the same service.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

{00480966.2 }

167.    This example from Aetna's website demonstrates the substantial liabilities that Aetna's members face when receiving treatment from out-of-network providers compared to receiving the same treatment from an in-network provider:

**Example 2: outpatient surgery**

You need outpatient surgery for a simple procedure and are deciding if you will have it done by a doctor in your plan's network. This example gives you an idea of how much you might owe depending on your choice.

| Outpatient surgery benefits details | | In network | Out of network |
|---|---|---|---|
| Surgery bill†† | Amount billed | $2,000 | $2,000 |
| Amount Aetna uses to calculate payment | Aetna's rate** in the network | $600** | |
| | Recognized amount*** out of network | | $1,600*** |
| What your plan pays | Aetna's negotiated rate/recognized amount | $600 | $1,600 |
| | Percent your plan pays | 80% | 60% |
| | Amount of Aetna's negotiated rate/recognized amount covered under plan | $480** | $960*** |
| What you owe | Your coinsurance responsibility | $120 | $640 |
| | Amount that can be balance billed to you | $0 | $400 |
| **Your total responsibility** | | **$120**† | **$1,040**† |

168.    The price sensitivity of Aetna's members is a substantial deterrent to abusive pricing by out-of-network providers; if members owe a fixed percentage of an allowed

amount for each service, and one provider charges ten times more for the same service than another provider, the member is incentivized to seek out the less expensive provider. Indeed, Aetna designs its benefit plans to incentivize members to choose more cost-effective providers, in part because Aetna is not involved in the patient's decision about where to obtain treatment.

169.    The following is exemplary language from Aetna plans regarding members' cost-sharing obligations when visiting out-of-network providers:

- "Out-of-network providers have not agreed to accept the negotiated charge. Aetna will reimburse you for a covered expense, incurred from an out-of-network provider, up to the recognized charge and the maximum benefits under this Plan, less any cost-sharing required by you such as deductibles and payment percentage.  The recognized charge is the maximum amount Aetna will pay for a covered expense from an out-of-network provider.  Your payment percentage is based on the recognized charge.  If your out-of-network provider charges more than the recognized charge, you will be responsible for any expenses incurred above the recognized charge.  Except for emergency services, Aetna will only pay up to the recognized charge."

- "You must satisfy any applicable deductibles before the plan begins to pay benefits."

- "Deductibles and payment percentage are usually higher when you use out-of-network providers than when you use network providers."

- "After you satisfy any applicable deductible, you will be responsible for any applicable payment percentage for covered expenses that you incur.  You will be responsible for your payment percentage up to the maximum out-of-pocket limits that apply to your plan."

- "Once you satisfy any applicable maximum out-of-pocket limit, the plan will pay 100% of the covered expenses that apply toward the limits for the rest of the Plan

1    Year.  Certain designated out-of-pocket expenses may not apply to the maximum

2    out-of-pocket limit."

3    ## THE COUNTERCLAIM-DEFENDANTS' SCHEME

4        170.    The OTCs and ARS conspired together to perpetrate a multifaceted scheme

5    designed to extract as much from Aetna as possible by: (a) billing tens or hundreds of

6    thousands of dollars in facility fees per visit by Aetna members, even though the OTCs

7    were not entitled to facility fees; (b) billing for claims for services that were not actually

8    rendered by the OTCs, or miscoding services not covered by Aetna so that it would appear

9    to Aetna that the OTCs provided covered services; (c) waiving Aetna member's cost-

10   sharing obligations to ensure that the OTCs and ARS could charge Aetna at abusive prices

11   without losing patients or referral sources; (d) misrepresenting the prices of the services

12   rendered by the OTCs to Aetna because neither ARS nor the OTCs ever intended to, or did,

13   seek payment of amounts owed by Aetna members in the form of cost-sharing or balances

14   in excess of amounts allowed by Aetna; and (e) upon information and belief, incentivizing

15   and taking steps to cause Aetna's in-network providers to breach their network contracts

16   with Aetna by systematically referring patients to the OTCs in violation of their network

17   contracts with Aetna.

18   *ARS Orchestrated the Scheme*

19       171.    ARS was involved in the scheme on multiple levels.

20       172.    *First*, on information and belief, in addition to providing billing services for

21   the OTCs, ARS also invested in the OTCs or took ownership interests in the OTCs in order

22   to better control the OTCs and effectuate the scheme.

23       173.    *Second*, on information and belief, ARS also recruited Aetna's in-network

24   providers to participate in the scheme and convinced them to refer Aetna members to out-

25   of-network facilities despite the referring providers' contractual obligations to refer to in-

26   network providers.

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

174.   *Third*, on information and belief, the OTCs each contracted with ARS to conduct, on behalf of the OTCs, the billing and appeals of claims to Aetna, as well as the collection on cost-sharing responsibilities from patients.

175.   ARS handled all billing of claims related to the scheme so that it could ensure that the exorbitant facility fees were billed and that services were billed—often in a fraudulent or misleading manner—to maximize the payments received by the OTCs and, thus, ARS.  By handling all out-of-network billing, ARS ensured that facility fees would, in fact be billed and that member cost-sharing obligations would be waived so as to hide the scheme from payors, like Aetna, for as long as possible.

**The Facility Fees Charged by the Counterclaim-Defendants**

176.   Facility fees are charges for the use of space and/or equipment in a location where a patient receives healthcare services, and are distinct from charges for the actual provision of the healthcare services.  Originally intended to cover the substantial and fixed overhead costs of facilities like hospitals, where round-the-clock preparedness and the ability to handle a wide variety of medical issues were required, patients receive one bill from the provider of healthcare services and a second bill from the facility within which the healthcare services were rendered (and potentially additional bills from other providers involved in the provision of healthcare services).

177.   During the period relevant to this dispute, the OTCs provided pain-management services to patients, including, but not limited to, epidural injections, trigger point injections, and platelet-rich plasma injections.

178.   Upon information and belief, unlike hospitals or other facilities where facility fees may be appropriate due to continuous preparedness obligations for any type of medical event, the OTCs performed a limited set of pain-management procedures on patients, and the OTCs operated during normal daytime business hours.  Moreover, the OTCs were licensed as outpatient treatment centers, and were not outpatient surgical centers (or comparable) under Arizona law.

179.    At all times relevant to this dispute, Aetna had in effect a publicly available policy restricting the situations where it would pay facility fees.

180.    Specifically, Aetna policy stated that, for any surgical procedure:

> [I]n order to be reimbursed for facility fees or any related surgical care charges, *e.g.*, pharmaceuticals, surgical supplies, operating room charges, the entity must be properly licensed by the state where the facility operates. Specifically, the facility must be licensed as an ambulatory surgical center or whatever comparable title is used by a state's licensing law to describe a freestanding facility, other than a physician's office, where surgical and diagnostic services are provided on an ambulatory basis.

181.    The facility fees charged by ARS and the OTCs to Aetna typically dwarfed the charges from providers who actually rendered the services.

182.    For example, in one case, Valley Pain Center of Peoria, LLC billed Aetna at total of $206,750.20 for a pain management injection. Of that total, $179,185.80 of the charges were for facility fees.  Aetna ultimately paid $110,505.53 of which $87,941.15 was payment for facility fees.   The type of services that were billed in this example are experimental and investigational and not covered by Aetna for pain management and the $179,185.80 claim for facility fees was unjustified because the procedure was not conducted in a properly licensed ambulatory surgery center. Attached hereto as Exhibit 1 is de-identified claims information with respect to this date of service for this Aetna member.

183.    Potentially because they were aware of Aetna's policy regarding facility fees, ARS and the OTCs often billed facility fees using codes that represented that the OTCs were operating as (and presumably were licensed as) ambulatory or outpatient surgery centers, rather than as the outpatient treatment centers they actually were.

184.    Specifically, the facility fees were typically billed using Revenue Code 490, which the National Uniform Billing Commission's Official UB-04 Data Specifications Manual states is titled "Ambulatory Surgical Care," and represents "[c]harges for ambulatory surgery not covered by other categories."  However, unbeknownst to Aetna and contrary to the representations made by ARS and the OTCs, the OTCs were licensed as

outpatient treatment centers, not as ambulatory or outpatient *surgery* centers, and therefore were not entitled to payment for facility fees under Aetna policy.

185.    As a result of the misrepresentations and omissions by ARS and the OTCs, Aetna was defrauded into paying the OTCs millions of dollars that it should not have paid.

186.    Upon information and belief, through its contracts with the OTCs, ARS received a substantial percentage of the funds improperly obtained from Aetna, and played a substantial role in causing the overpayments by Aetna, including the submission of the claims at issue.

***The Counterclaim-Defendants' Billings for Non-Covered Services***

187.    A review of the claims submitted by ARS, along with relevant medical records,[9] demonstrates that ARS and the OTCs also fraudulently billed claims for experimental and investigational procedures which are not covered by Aetna.

188.    To induce Aetna to pay claims for non-covered services, ARS and the OTCs took affirmative steps to misrepresent the actual medical services that were provided.

189.    Specifically, ARS and the OTCs submitted numerous claims for reimbursement that Aetna subsequently learned were for or related to the injection of platelet-rich plasma, amniotic fluid, and bone marrow—none of which are covered by Aetna for pain management.

190.    Upon information and belief, ARS and the OTCs were aware or should have been aware, that these procedures were not covered by Aetna.  If these procedures had been billed according to industry-standard billing practices, they would have been denied by Aetna.  In many cases, however, ARS and the OTCs did not include the code for the substance injected—which is the information that would show that the procedure was experimental and investigational and, thus, not covered by Aetna.

191.    For example, an Aetna member treated at Valley Pain Center of Peoria was given an injection of platelet-rich plasma, which is not a covered service under Aetna's

---

[9] When Aetna made initial payment determinations on the claims at issue, it did not have the benefit of the medical records referenced in this paragraph.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

policies.[10]  The claim submitted by ARS and Valley Pain Center of Peoria did not identify the service rendered as a platelet-rich plasma injection and did not use the CPT code designated for platelet-rich plasma injections, 0232T.  Instead, ARS and Valley Pain Center of Peoria billed Aetna for the injection using a generic injection code.  ARS and the Valley Pain Centers charged Aetna $49,654 for this non-covered service, inclusive of the injection procedure, facility fees, and a charge for anesthesia services.  Reasonably relying on the information contained on the claim, Aetna paid Valley Pain Center of Peoria $33,585 as a result of this fraudulent billing. Attached hereto as Exhibit 2 is de-identified claims information with respect to this date of service for this Aetna member.

***Misrepresentation of Services Rendered***

192.   A review of the claims submitted by ARS, along with associated medical records demonstrates that ARS and the OTCs also misrepresented the services rendered in billing Aetna.

193.   Aetna has uncovered multiple examples of cases in which ARS and the OTCs submitted, and received payments for, claims for anesthesia services that were not in fact provided, as is evidenced by the corresponding medical records.

194.   For example, ARS billed Aetna for services performed by Arizona Pain Ventures, LLC on November 1, 2018. On that bill was included a charge for $10,200 for Revenue Code 0379 (other anesthesia), but corresponding medical records show that no anesthesia was administered. Attached hereto as Exhibit 3 is de-identified claims information with respect to this date of service for this Aetna member.

***Restrictions on In-Network Providers' Referrals to Out-of-Network Providers***

195.   Aetna's contracts with its in-network providers typically include provisions requiring the providers to refer to other in-network providers, except in certain situations (*e.g.*, emergencies or where Aetna has authorized the referral).

---

[10] http://www.aetna.com/cpb/medical/data/700_799/0784.html.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

196.    The following is a representative example of a referral provision in a contract between Aetna and an in-network provider who appears to have referred one of the Plaintiffs to one of the OTCs:

> Physician agrees to refer, and/or admit or arrange for admission of Members only to Participating Hospitals, Participating Ancillary Facilities (including, but not limited, to surgery centers), and other Participating Providers directly contracted with Company unless the referral, and/or admission is either authorized in advance by Company for good cause, or in cases of Emergency Services, or after informed consent of the patient has been documented, in writing, as set forth in subsection 2.3.2 below.

197.    In the same contract, the informed consent required to be obtained from the Aetna member for non-emergency services was designed to make clear to the member the potentially substantial financial implications of seeing an out-of-network provider:

> For Members who have a Plan that allows for Non-Participating Provider (defined as those providers who do not have a valid direct contract with [Aetna]), if Physician admits or arranges for admission to a Non-Participating Hospital or Facility, or refers a Member to a Non-Participating Provider, Physician shall document the Member's written consent, and that he or she has provided Member notice of the following information:
> (1) the hospital, facility, or provider is non-participating; and
> (2) the Member's Plan may, therefore, provide reduced benefits;
> (3) the Non-Participating Hospital, Facility, or Provider will not be restricted to seeking payment only from Company; and
> (4) the Non-Participating Hospital, Facility, or Provider may bill the Member for amounts other than deductibles, co-payments, coinsurance, and medical services not covered under the Member's Plan; and
> (5) Physician's affiliation or financial ownership interest in or with the Non-Participating Hospital, Facility, or Provider (if applicable).

198.    Other contracts with in-network providers also contain similar provisions which require the providers to refer or admit Aetna members only to Participating Providers for Covered Services under most circumstances.

199.    These referral provisions in Aetna's contracts with its in-network providers represent another mechanism through which Aetna can limit the cost of care, by encouraging in-network providers and members to use other in-network providers that have negotiated reimbursements with Aetna.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

200.    Upon information and belief, ARS and the OTCs caused Aetna's in-network providers to breach their contractual obligation to refer Aetna members to other in-network providers, including by incentivizing the in-network providers to refer their patients to the OTCs in violation of their contracts with Aetna.

201.    Many of the providers who referred Aetna members to the OTCs, and who provide services at the OTCs, are in-network with Aetna.[11] By treating Aetna members at the OTCs, or causing Aetna members to be treated at the OTCs, these in-network providers effectively caused the Aetna members to incur out-of-network charges in violation of the providers' network contracts with Aetna, which prohibit referrals to out-of-network providers except in certain circumstances (none of which are applicable with the services at issue) and require the in-network providers to obtain the Aetna members' written, informed consent before exposing them to such charges.

202.    In addition, ARS and the OTCs have developed relationships with one or more in-network providers who bill for services provided in connection with the OTCs as out-of-network providers.  These in-network providers used the Tax Identification Numbers of the OTCs to bill *as an out-of-network provider* for services performed in connection with the OTCs.

***The Counterclaim-Defendants' Waiver of Aetna Members' Cost-Sharing Obligations***

203.    To ensure that providers would continue to refer their patients to the OTCs, that patients (including repeat patients) would continue to seek treatment at the OTCs, and that ARS and the OTCs could continue to charge Aetna and its self-funded plan sponsors at their exorbitant prices, ARS and the OTCs took steps to, among other things, (a) systematically waive Aetna's members' cost-sharing obligations, causing the Aetna members to breach their contracts with Aetna and rendering the prices billed by ARS and

---

[11] As Valley Pain Centers stated in response to a negative review online, "[a]lthough we may be out of network with your particular insurance plan, we will be happy to see you & will bill your care to your out of network benefits.  Our Providers are in network with ALL of the major insurance plans."

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

the OTCs to Aetna untruthful; and (b) agree not to balance bill the Aetna members for services rendered by the OTCs.

204.    The documents cited below show that ARS and the OTCs were aware of, and reiterated in their own documents, Aetna members' obligations to pay coinsurance, deductibles, and other types of cost-sharing under the terms of their benefit plans.

205.    For example, in the Assignment of Benefits document that ARS or the OTCs prepared and made Aetna's members sign, ARS and the OTCs required Aetna's members to state their understanding that they (the Aetna members) "will be jointly and severally financially responsible for any portion of the Provider invoice that is not paid."  (*See* Dkt. 1-1 at 5 ¶ 1; *see also id.* ("I agree that I will be jointly and severally financially responsible for any portion of the claim, in whole or in part, that is not paid.").)  The same document required Aetna's members to state that they "understand [they are] responsible for any health insurance deductibles and co-payments[.]"  (*Id.*)  In addition, the Assignment of Benefits form required Aetna's members to confirm that, if they failed to fulfill any of the "obligations" in the Assignment of Benefits form, the Aetna member would "remain personally liable for payment for the Services to the furthest extent of the law."  (*Id.*)  These documents show that ARS and the OTCs were aware that Aetna members had obligations to pay coinsurance, deductibles, and other types of cost-sharing.

206.    In spite of the clear awareness by ARS and the OTCs of the Aetna members' cost-sharing obligations, Aetna members were informed in documents prepared by ARS or the OTCs that, so long as they cooperated with ARS and the OTCs in their efforts to extract payment from Aetna, the Aetna members themselves would not owe anything out of pocket.

207.    Specifically, upon information and belief, the OTCs and ARS required Aetna members to complete a form entitled "Authorization of Representation and Specific Power of Attorney."  (*See* Dkt. 1-1 at 4-6; Dkt. 1 at ¶ 13.)  The Authorization of Representation and Specific Power of Attorney stated that if an Aetna member revokes any of the forms necessary to fully and properly adjudicate a claim, this may "result in in all outstanding balances being owned by the beneficiary" (i.e., by the Aetna member).  (*See* Dkt. 1-1 at 5.)

In other words, as long as the Aetna member signed the forms proffered by ARS and the OTCs, the Aetna member would not owe any amounts directly; if the Aetna member refused to sign the forms proffered by ARS and the OTCs, the Aetna member would owe "all outstanding balances."

208.    The Authorization of Representation and Specific Power of Attorney also stated that if Aetna did not pay the entire claim billed by ARS and the OTCs because the Aetna member "fail[ed] to cooperate," then the Aetna member could be "responsible for the full payment of the claim." (*Id.* at 6.)

209.    These documents conveyed to the Aetna members that, so long as they agreed to cooperate with ARS and the OTCs in their efforts to get Aetna to pay the claims in full, the Aetna member would not owe any amounts directly to ARS or the OTCs.

210.    In addition, before filing the Complaint, ARS sent a letter to Aetna members informing them that, if they opted not to participate in this lawsuit, the OTCs "may hold [the Aetna member] responsible for the full cost of the medical services provided to [the Aetna member]." (*See* Exhibit 4.)  However, if the Aetna member did nothing (and would, as a result, be named by ARS and the OTCs as a plaintiff in this lawsuit), "ARS and the [OTCs] will only seek payment for the medical services provide to you from Aetna or plan, and not from you." (*Id.* at 2 (emphasis added).)  This was yet another example of ARS and the OTCs driving home the point to Aetna members that, so long as they followed the instructions of ARS and the OTCs, ARS and the OTCs would not seek to hold the Aetna members responsible for any balance bill or for the cost-sharing obligations that the Aetna members were required to pay under their member contracts with Aetna; amounts that, because of the abusive pricing of ARS and the OTCs and the fact that the OTCs were out-of-network, could be astronomical.

211.    Aetna has interviewed members who received treatment at the OTCs, and the interviews conducted to date confirm that ARS and the OTCs have a pattern of waiving or not taking steps to collect cost-sharing obligations required to be paid by the Aetna members under the terms of their plans.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

212.   Thus, the documents used by ARS and the OTCs and Aetna's interviews of its members demonstrate that ARS and the OTCs systematically waived Aetna members' contractually required cost-sharing obligations.

## COUNTERCLAIM ONE

### (Tortious Interference with Contract)

### (All Counterclaim Defendants)

213.   Aetna repeats and realleges paragraphs 107 through 212 hereof, as if fully set forth herein.

214.   During the relevant period, Aetna had valid contracts with each of its members in the form of benefit plans insured and/or administered by Aetna.

215.   The terms of the Aetna members' benefit plans were set forth in individual contracts between the members and Aetna.

216.   These contracts contained provisions that required Aetna's members to satisfy their cost-sharing obligations associated with healthcare services they received, including their deductibles, coinsurance obligations, and copayments, by making those payments to the providers.

217.   ARS and the OTCs knew of the existence of Aetna's contracts with its members, and specifically knew of the Aetna members' obligations under those contracts to, among other things, pay applicable deductibles, copays, and coinsurance.  For example, in the Assignment of Benefits form used by the OTCs and ARS, the OTCs and ARS required the Aetna members to confirm that they "understand [they are] responsible for any health insurance deductibles and co-payments[.]"  (Dkt. 1-1 at 5 ¶ 1.)

218.   Despite this knowledge, ARS and the OTCs intentionally interfered with, attempted to defeat, and procured the breach of the Aetna members' contracts by waiving or failing to collect the required cost-sharing responsibilities.

219.   ARS and the OTCs took affirmative steps, as set forth herein and as Aetna expects to uncover through discovery, to cause Aetna's members to fail to pay their contractually obligated deductibles, copays, and coinsurance for services purportedly

rendered by the OTCs and billed on behalf of the OTCs by ARS.  For example, the OTCs and ARS promised Aetna's members that the Aetna members would not owe, and ARS and the OTCs would not seek payment of, any amounts from the Aetna members individually (often thousands or tens of thousands of dollars) if the Aetna members provided certain information and cooperation to ARS and the OTCs.

220.    The conduct of ARS and the OTCs constitutes wrongful interference with Aetna's contractual relationships with its members.

221.    There is no justification for the interference and procurement of these breaches by ARS and the OTCs.

222.    Because of the actions taken by ARS and the OTCs, the Aetna members at issue breached material terms of their member benefit contracts with ARS.

223.    Because of the breach of the member benefit contracts caused by ARS and the OTCs, Aetna has been damaged in the form of unnecessary payments to the OTCs subsequent to and as a result of those breaches.  The amount of Aetna's damages shall be determined at trial.

224.    By virtue of the foregoing, Aetna is entitled to an award of compensatory damages and punitive damages together with interest and costs, injunctive relief, and any other relief the Court deems just and proper.

## COUNTERCLAIM TWO

### (Fraud)

### (All Counterclaim Defendants)

225.    Aetna repeats and realleges paragraphs 107 through 212 hereof, as if fully set forth herein.

226.    ARS and the OTCs knowingly made material misrepresentations and omissions to Aetna in claims for reimbursement that they submitted, or caused to be submitted, with the intent to induce Aetna to rely on those misrepresentations and omissions and to make benefits payments for the associated claims, as described in the paragraphs below.

227.     The submission of a claim to Aetna constitutes a certification and representation that the information shown on the claim is true, accurate, and complete, and that the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

228.     ARS and the OTCs represented to Aetna that they were ambulatory surgical centers (or equivalent), and were entitled to be reimbursed for facility fees, when in fact they were not ambulatory surgical centers (or equivalent) and were not entitled to reimbursement for facility fees under Aetna policy.

229.     Each time ARS and the OTCs submitted a claim seeking reimbursement for facility fees in connection with services rendered to an Aetna member, and particularly when billing using Revenue Code 490 (for Ambulatory Surgical Care), ARS and the OTCs represented that the OTCs were ambulatory surgery centers (or equivalent), and were entitled to payment from Aetna for the facility fees, surgical supplies, and other charges.

230.     That the OTCs were not ambulatory surgery centers (or equivalent) is information material to Aetna's determination of whether facility fees billed by ARS and the OTCs were payable.

231.     The charges and codes contained in the claims submitted to Aetna by ARS and the OTCs are material information related to Aetna's determination of whether the claims are payable and, if so, in what amount they are to be paid.

232.     ARS and the OTCs knew that the OTCs were outpatient treatment centers, and not ambulatory surgery centers (or equivalent) entitled to reimbursement for facility fees under Aetna policy.

233.     ARS and the OTCs knew that the facility fee charges and codes contained in claims submitted to Aetna falsely represented that the OTCs were ambulatory surgery centers, when in fact they were outpatient treatment centers.

234.     Each time ARS and the OTCs submitted a claim seeking reimbursement for services provided to an Aetna member, they represented that they had collected or would

make a good faith effort to collect the corresponding cost-sharing obligations from that member, including copay, deductible, and coinsurance obligations.

235.   That ARS and the OTCs waived Aetna plan members' cost-sharing obligations is information material to Aetna's determination of whether claims submitted by ARS and on behalf of the OTCs are payable.

236.   ARS and the OTCs knew that their representations that they collected or would make a good faith effort to collect Aetna members' cost-sharing obligations were false because ARS and the OTCs in fact waived or failed to collect patient cost-sharing responsibilities for Aetna members.

237.   ARS and the OTCs made the aforementioned material misrepresentations and omissions with the intent to induce Aetna to make payments on the claims (and to make payments for amounts) that they were not obligated to make and otherwise would not have made absent ARS's and the OTCs' misrepresentations (*e.g.*, where an Aetna member's deductible was not actually paid, Aetna would not owe anything for the services to the OTCs; where an outpatient treatment center was billing for a facility fee, Aetna would not owe anything for the facility fee under Aetna policy).

238.   Aetna reasonably relied on the aforementioned misrepresentations and omissions and made payments on the submitted claims.  Aetna reasonably expected ARS and the OTCs to lawfully collect the Aetna members' financial responsibility as required under the terms of their respective benefit plans and reasonably relied on the statements of ARS and the OTCs that they had in fact lawfully collected the Aetna members' financial responsibility.  Because Aetna processes over one million claims per workday, the vast majority are auto-adjudicated, meaning that so long as the claims is "complete," or has all of the required fields filled out, the claim will be paid.  Due to the volume of claims that Aetna processes on a daily basis, Aetna cannot review every claim and underlying medical record for accuracy before payment—doing so would grind the healthcare system to a halt. Instead, as with any provider, Aetna relied on ARS's and the OTCs' certifications that the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

information submitted in the claims was true, accurate, and complete, and that ARS and the OTCs did not knowingly or recklessly disregard or misrepresent or conceal material facts.

239.   Aetna reasonably relied on the aforementioned misrepresentations and omissions relating to the nature of the OTCs and their services, and made payment on the submitted claims (including the facility fees included thereon).   Moreover, once Aetna identified that the OTCs were outpatient treatment centers and not ambulatory surgical centers (or equivalent), it stopped paying facility fees billed by ARS and the OTCs.

240.   As a direct and proximate result of ARS and the OTCs' misrepresentations and omissions, Aetna has been damaged in a substantial amount to be determined at trial.

241.   By virtue of the foregoing, Aetna is entitled to an award of compensatory damages and punitive damages together with interest and costs, injunctive relief, and any other relief the Court deems just and proper.

## COUNTERCLAIM THREE

### (Negligent Misrepresentation)

### (All Counterclaim Defendants)

242.   Aetna repeats and realleges paragraphs 107 through 212 hereof, as if fully set forth herein.

243.   The charges contained in the claims submitted to Aetna by ARS and the OTCs are material information related to Aetna's determination of whether claims are payable and, if so, in what amount they are to be paid.

244.   That ARS and the OTCs have waived Aetna members' cost-sharing obligations is material information related to Aetna's determination of whether claims submitted by ARS or the OTCs are payable.

245.   That the OTCs were not ambulatory surgery centers (or equivalent) is information material to Aetna's determination of whether facility fees billed by ARS and the OTCs were payable.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

246.    The submission of a claim constitutes a certification and representation that the information shown on the claim is true, accurate, and complete, and that the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

247.    The submission of claims by ARS and the OTCs to Aetna happened in the course of their business.

248.    Each time ARS and the OTCs submitted a claim seeking reimbursement for facility fees in connection with services rendered to an Aetna member, and particularly when billing using Revenue Code 490 (for Ambulatory Surgical Care), ARS and the OTCs represented that the OTCs were ambulatory surgery centers (or equivalent), and were entitled to payment from Aetna for the facility fees, surgical supplies, and other charges.

249.    By submitting claims seeking reimbursement for services that the OTCs provided to Aetna members, ARS and the OTCs represented that the charges stated in those claims were for services that had been rendered lawfully and consistent with public policy, and that the prices charged to Aetna were the real charges for the services rendered.

250.    By submitting claims seeking reimbursement for services that the OTCs provided to Aetna members, ARS and the OTCs represented that they had collected or would make a good faith effort to collect the corresponding cost-sharing obligations from the Aetna members.  Those representations were false; ARS and the OTCs waived or failed to take steps to collect the Aetna members' cost-sharing obligations required.

251.    ARS and the OTCs knew the representations were false, made them without knowledge of their truth or falsity, or made them under circumstances in which ARS and the OTCs ought to have known of their falsity.  ARS and the OTCs intended or expected that Aetna would rely on their misrepresentations.

252.    Aetna justifiably relied on the misrepresentations made or caused to be made by ARS and the OTCs, and was damaged as a result by making payments on the claims that were submitted.

253.   ARS and the OTCs had superior and special knowledge of their practices of waiving the Aetna members' cost-sharing obligations, which is not discoverable by ordinary observation.

254.   ARS and the OTCs had superior and special knowledge of the true nature of the OTCs' businesses and licensure (and the fact that they were not entitled to reimbursement for facility fees under Aetna policy as a result).

255.   ARS and the OTCs had a duty to disclose to Aetna information material to the claims that they submitted for reimbursement and benefits payments.

256.   ARS, the OTCs, and Aetna understood that, under the circumstances, ARS and the OTCs had a special relationship of trust and confidence toward Aetna that gave rise to a duty to speak and disclose material information regarding the claims being submitted. Aetna auto-adjudicates most of the claims it receives, and it relied on ARS's and the OTCs' certifications that the information submitted in the claims was true, accurate, and complete, and that ARS and the OTCs did not knowingly or recklessly disregard or misrepresent or conceal material facts.

257.   In connection with the claims submitted to Aetna, ARS and the OTCs negligently, and without exercising reasonable care or competence, failed to disclose that they had waived or failed to collect the Aetna members' cost-sharing obligations.

258.   In connection with the claims submitted to Aetna for payment, ARS and the OTCs failed to disclose that they were outpatient treatment centers, and instead misrepresented that they were ambulatory surgery centers (or equivalent) entitled to reimbursement for facility fees under Aetna policy.

259.   Aetna justifiably relied on the misrepresentations made by ARS and the OTCs, and was damaged as a result by making payments on the claims that were submitted.

260.   As a direct and proximate result of ARS and the OTCs' misrepresentations and omissions, Aetna has been damaged in a substantial amount to be determined at trial.

261.   By virtue of the foregoing, Aetna is entitled to an award of compensatory damages and punitive damages together with interest and costs, injunctive relief, and any other relief the Court deems just and proper.

## COUNTERCLAIM FOUR

### (Civil Conspiracy)

### (All Counterclaim Defendants)

262.   Aetna repeats and realleges paragraphs 107 through 212 hereof, as if fully set forth herein.

263.   ARS and the OTCs have conspired with each other and referring providers to unlawfully, fraudulently, and deceptively procure funds from Aetna for services and fees that the OTCs were not entitled to for the reasons set forth above through fraud, negligent misrepresentation, and tortiously interfering with Aetna's contracts with members and in-network providers as set forth above.

264.   In order to achieve and accomplish the aforementioned unlawful acts and objectives, ARS, the OTCs, and referring providers conspired and agreed to take overt acts to (1) refer members to out-of-network OTCs, (2) waive member cost-sharing obligations, (3) bill Aetna for facility fees as if the OTCs were ambulatory surgical centers when they were not, (4) misrepresent the charges billed to Aetna by failing to disclose to Aetna that member cost-sharing obligations were waived, and (5) billing for claims for services that were not actually rendered by the OTCs, or miscoding services not covered by Aetna so that it would appear to Aetna that the OTCs provided covered services.

265.   The concerted actions of ARS, the OTCs, and referring providers have caused Aetna to be damaged in an amount to be determined at trial.

266.   ARS, the OTCs, and the referring providers engaged in aggravated and outrageous conduct with an intent to injury or defraud, or deliberately interfere with the rights of Aetna and its members, consciously disregarding the unjustifiably substantial risk of harm to Aetna and its members.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

267.    The concerted action has caused Aetna to be damaged by paying substantial reimbursements for fees and services that were fraudulent and not reimbursable.  By virtue of the foregoing, Aetna is entitled to an award of compensatory and punitive damages together with interest and costs, an injunction prohibiting ARS and the OTCs from continuing to engage in the tortious and unlawful conduct described above, and any other relief the Court deems just and proper.

## COUNTERCLAIM FIVE

### (Aiding and Abetting a Tort)

### (All Counterclaim Defendants)

268.    Aetna repeats and realleges paragraphs 107 through 212 hereof, as if fully set forth herein.

269.    ARS and the OTCs engaged in the commission of torts against Aetna, as set forth herein.

270.    ARS and the OTCs knew that the conduct described in this pleading was occurring and was a breach of duties owed to Aetna, including because of the duties imposed on them by their submission of claims for payment to Aetna (*e.g.*, the certification contained on the claims submitted to Aetna on a Form UB-04).

271.    Each Counterclaim-Defendant actively participated in the scheme and provided substantial assistance or encouragement to the other participants.

272.    When each Counterclaim-Defendant took the acts set forth herein, which constitute substantial assistance or encouragement to the other tortfeasors, they knew that the conduct was tortious.

273.    Aetna has been damaged by the scheme in an amount to be determined in this litigation.

274.    Because each Counterclaim-Defendant knew of the scheme and gave substantial assistance to further the scheme, each Counterclaim-Defendant is subject to liability for the torts committed in furtherance of the scheme.

## COUNTERCLAIM SIX

### (Restitution under 29 U.S.C. § 1132(a)(3))

### (All Counterclaim Defendants)

275.    Aetna repeats and realleges paragraphs 107 through 212 hereof, as if fully set forth herein.

276.    Aetna acts as a claims administrator for certain health benefit plans governed by ERISA, 29 U.S.C. § 1001, *et seq.* (the "ERISA Plans").

277.    ERISA Section 502(a)(3) permits fiduciaries to enjoin any acts or practices that violate any provisions of the ERISA Plans, and to obtain other appropriate relief to redress such violations or enforce provisions of the ERISA Plans.

278.    ARS and the OTCs have engaged in a scheme to cause Aetna and the ERISA Plans to pay amounts in excess of the amounts owed under the terms of the ERISA Plans, and for services that are not covered under the terms of the ERISA Plans.

279.    Aetna seeks equitable relief in the form of restitution, equitable liens, and a constructive trust on the amounts overpaid to ARS and the OTCs by the terms of the ERISA Plans.

280.    Upon information and belief, the funds that ARS and the OTCs caused Aetna to overpay remain in the possession or control of ARS and the OTCs or are otherwise traceable and, in equity and good conscience, should be returned to Aetna.

281.    Aetna also seeks recovery of reasonable and necessary attorney's fees and costs pursuant to ERISA Section 502(g)(1).

## COUNTERCLAIM SEVEN

### (Unjust Enrichment)

### (All Counterclaim Defendants)

282.    Aetna repeats and realleges paragraphs 107 through 212 hereof, as if fully set forth herein.

283.    Aetna conferred a benefit upon ARS and the OTCs, at Aetna's expense, in the form of payments made in reliance on claims submitted to Aetna by ARS and the OTCs.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

284.   ARS and the OTCs received a direct benefit from those payments.

285.   ARS and the OTCs have voluntarily received and retained the payments made by Aetna

286.   It was not intended or expected that the benefits conferred by Aetna would be conferred gratuitously, nor was the benefit conferred officiously.

287.   For the reasons set forth herein, it would be unjust, unfair, and inequitable to allow ARS or the OTCs to retain the benefit of the payments, which belong in equity and good conscience to Aetna.

## COUNTERCLAIM EIGHT

### (Money Had and Received)

### (All Counterclaim Defendants)

288.   Aetna repeats and realleges paragraphs 107 through 212 hereof, as if fully set forth herein.

289.   As set forth herein, each of ARS and the OTCs received or obtained possession of funds belonging to Aetna.

290.   Each of ARS and the OTCs thereby appreciated a benefit.

291.   The acceptance and retention of Aetna's funds by ARS and the OTCs is unjust, and in equity and good conscience, the funds should be returned to Aetna.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Aetna demands a trial by jury on all issues in this action so triable or right.

## PRAYER FOR RELIEF

WHEREFORE, Aetna respectfully requests an award in its favor and granting the following relief:

A.   An award enjoining and prohibiting ARS, the OTCs, and/or their agents, servants, employees, officers, attorneys, successors, and assigns from submitting fraudulent claims or deceptive claims for reimbursement and waiving member cost-sharing obligations described herein.

{00480966.2 }

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    B.     An award of actual damages in an amount to be proven at trial;

2    C.     An award of punitive damages as requested herein;

3    D.     An award of equitable relief requested herein;

4    E.     An award of attorneys' fees pursuant to ERISA Section 502(g)(1);

5    F.     An award of costs;

6    G.     An award of prejudgment and post-judgment interest; and

7    H.     An award of any other relief in law or equity that the Court deems just and

8           proper.

9

10   Respectfully submitted this 23rd day of January, 2020.

11                                              COPPERSMITH BROCKELMAN PLC

12                                              By s/ Keith Beauchamp
13                                                 Keith Beauchamp
                                                   Shelley Tolman
14
15                                              ROBINS KAPLAN LLP

                                                   Jeffrey S. Gleason
16                                                 Jamie R. Kurtz
                                                   Nathaniel J. Moore
17                                                 Eric B. Boettcher
18
                                                *Attorneys for Defendants/Counterclaimants*
19
20
21
22
23
24
25
26
27
28

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that on January 23, 2020, I electronically transmitted the attached

3  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to all CM/ECF registrants.

5

6                              s/ Sheri McAlister

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS