**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Advanced Reimbursement Solutions LLC, et al., | No. CV-19-05395-PHX-DLR |
| Plaintiffs, | **ORDER** |
| v. | |
| Aetna Life Insurance Company, et al., | |
| Defendants. | |

Counterclaim-Plaintiffs are Aetna, Inc., and Aetna Life Insurance Company ("Aetna"). Counterclaim-Defendants are Advanced Reimbursement Solutions, LLC ("ARS"), American Surgical Development, LLC ("ASD"), and 9 outpatient treatment centers ("OTCs").[1] Pending before the Court are motions to dismiss Aetna's Second Amended Counterclaim ("SACC") filed by ARS and ASD (Doc. 262) and the remaining OTCs (Docs. 274 and 284). Also before the Court is Aetna's motion for leave to amend its SACC. (Doc. 437.) As explained below, the Court grants in part and denies in part ARS and ASD's motion to dismiss, denies the remaining OTCs' motions to dismiss, and grants Aetna's motion for leave to amend.[2]

---

[1] Aetna named 19 OTCs, but only 9 remain. The remaining OTCs fall into two separately represented groups: (1) Arrowhead Outpatient Treatment Center, LLC; Lakeshore Interventional Treatment Center, LLC; Mesa Outpatient Treatment Center, LLC; Tempe Interventional Treatment Center, LLC; Tempe Outpatient Treatment Center, LLC; and West Valley OTC, LLC (collectively, "Treatment Center OTCs"), and (2) Valley Pain Centers LLC; Valley Pain Centers of Peoria, LLC; and Valley Pain Centers of Arizona, LLC (collectively, "Pain Center OTCs").

[2] Oral argument is denied because the issues are adequately briefed, and oral

1

## I.     Background[3]

2          Aetna brings counterclaims on its own behalf as the provider of fully insured health

3   plans, and in its capacity as claims administrator for self-funded, employer-established

4   health plans that retain Aetna as a third-party administrator.  For fully insured plans, Aetna

5   pays claims using its own money.  For self-funded plans, claims are paid directly by

6   employers and employees using their own money, but in its capacity as claims

7   administrator, Aetna is authorized by contract to bring actions to recover overpayments on

8   behalf of those plans.  (Doc. 203-1 ¶¶ 43-49.)

9          Aetna policy and the terms of Aetna's plans set forth several requirements designed

10   to impose reasonable limits on the cost of care.  For example, Aetna members have cost-

11   sharing obligations.  (Id. ¶ 53.)  Plan members generally are required to pay an annual

12   deductible before plan benefits are triggered.  Once members have paid their deductibles,

13   the plans then generally require members to pay coinsurance—a percentage of the cost—

14   for the healthcare services they receive, until they meet a plan-prescribed out-of-pocket

15   maximum.  Members also sometimes are required to pay fixed dollar amounts called

16   copays at the time they receive certain healthcare services.  (Id. ¶¶ 54-56.)  Aetna's

17   Copayment and Coinsurance Waivers Payment Policy requires providers to collect

18   copayments and coinsurance as defined by a member's plan and prohibits providers from

19   waiving those obligations.  (Id. ¶ 57.)

20          Aetna also controls costs by entering into network contracts with healthcare

21   providers that set rates Aetna will pay for services rendered by the in-network provider.

22   Out-of-network providers, by contrast, have not agreed to a particular reimbursement for

23   their services and therefore can charge more that in-network providers.  (Id. ¶ 60.)  But to

24   discourage members from obtaining care from more expensive, out-of-network providers,

25   Aetna typically imposes on members higher coinsurance obligations for out-of-network

26   services, and Aetna members are responsible for the difference between what the out-of-

27   argument will not aid the Court's decision-making.  *See* Fed. R. Civ. P. 78(b); LRCiv.

28   7.2(f).  [3]  The following facts are derived from Aetna's SACC and presumed true for
purposes of this order.

network provider bills Aetna and the amount allowed by Aetna.  (*Id.* ¶¶ 61-62.)

The OTCs contracted with ARS and ASD to provide, among other things, billing services and back-office support in exchange for a portion of the OTCs' reimbursements. (*Id.* ¶¶ 66-81.)  Aetna alleges that Counterclaim-Defendants "engag[ed] in a multi-faceted out-of-network billing scheme intended to extract extraordinarily inflated payments from Aetna and its self-funded plan sponsors simply because Aetna members received treatment from medical professionals at the OTCs' offices."  (*Id.* ¶ 1.)  In particular, Aetna accuses Counterclaim-Defendants of:

> (a) causing Aetna's contracted providers to refer patients to the out-of-network OTCs in violation of their provider contracts; (b) causing in-network providers to perform services at out-of-network OTCs in violation of their contracts; (c) inducing Aetna members to violate the terms of their insurance plans, including by waiving the Aetna members' cost-sharing obligations, which otherwise would have served as a deterrent to Aetna members' use of the OTCs; (d) improperly billing for facility fees on behalf of the OTCs, including misrepresenting the licensure and nature of the OTCs, despite the fact that industry-standard practices and Aetna policy prohibited the billing of facility fees by OTCs; (e) misrepresenting the OTCs' rates and instead billing at rates required by ARS, which artificially inflated the OTCs' charges by up to 4,900%; (f) misrepresenting the medical services actually rendered to Aetna members; and (g) billing for uncovered and experimental medical treatments.

(*Id.* ¶ 83.)

Aetna's detailed, 336-paragraph SACC contains 13 separate claims: (1) tortious interference with its Member Benefit Plans, brought against all Counterclaim-Defendants; (2) tortious interference with its Provider Contracts, brought against all Counterclaim-Defendants; (3) fraud, brought against all Counterclaim-Defendants; (4) negligent misrepresentation, brought against all Counterclaim-Defendants; (5) violations of the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c), brought against ARS and ASD only; (6) violation of RICO, 18 U.S.C. § 1962(d), brought against ARS and ASD only; (7) violation of Arizona's version of RICO, A.R.S. § 13-2314.01, brought against ARS and ASD only; (8) conspiracy to violate Arizona's RICO statute, brought against ARS and ASD only; (9) civil conspiracy, brought against all

1    Counterclaim-Defendants; (10) aiding and abetting a tort, brought against all
2    Counterclaim-Defendants; (11) for recoupment of overpayments under the Employee
3    Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(3), brought against all
4    Counterclaim-Defendants; (12) unjust enrichment, brought against all Counterclaim-
5    Defendants; and (13) money had and received, brought against all Counterclaim
6    Defendants. (Doc. 203-1.)

7    **II.    Legal Standard**

8            The Federal Rules of Civil Procedure require a pleading to contain "a short and plain
9    statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P.
10   8(a)(2). "To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual
11   allegations; rather, it must plead 'enough facts to state a claim to relief that is plausible on
12   its face.'" *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008)
13   (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). When ruling on a motion to
14   dismiss, the Court does not assess whether the pleading's allegations are, in fact, true.
15   Instead, well-pled factual allegations are accepted as true and construed in the light most
16   favorable to the pleader. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). The
17   Court's task merely is to determine whether those well-pled factual allegations plausibly
18   state a claim to relief under governing law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

19           The federal rules, however, set a heightened pleading standard for allegations of
20   fraud. "In alleging fraud . . . a party must state with particularity the circumstances
21   constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's
22   mind maybe alleged generally." Fed. R. Civ. P. 9(b). "Averments of fraud must be
23   accompanied by the who, what, when, where, and how of the misconduct charged." *Vess*
24   *v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quotations and citation
25   omitted). Ordinarily, Rule 9(b)'s heightened pleading standard applies only to averments
26   of fraud; "[t]he rule does not require that allegations supporting a claim be stated with
27   particularity when those allegations describe non-fraudulent conduct." *Id.* at 1104. But
28   "[i]n some cases, the plaintiff may allege a unified course of fraudulent conduct and rely

entirely on that course of conduct as the basis of a claim.  In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Id.* at 1103-04.

When multiple defendants sued in connection with an alleged fraudulent scheme, there is no requirement that the pleader identify every instance of fraudulent conduct for every defendant. *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).  Though "Rule 9(b) does not allow a complaint to merely lump multiple defendants together," in fraud suits involving multiple defendants it is sufficient for a pleader to identify the role each defendant played in the alleged fraudulent scheme. *Id.* at 764-65.  Further, in cases such as this one, involving hundreds or thousands of alleged fraudulent transactions, specifying each and every transaction with the particularity ordinarily demanded by Rule 9(b) "is neither practical nor required." *Nutrishare, Inc. v. Connecticut Gen. Life Ins. Co.*, No. 2:13-cv-02378-JAM-AC, 2014 WL 1028351, at *4 (E.D. Cal. Mar. 14, 2014).  "When dealing with thousands of instances, it is often the case that a complaint or counterclaim laying out each and every misrepresentation in detail would provide less effective notice and be less useful in framing the issues than would a shorter, more generalized version." *Id.*

Indeed, Rule 9(b) serves four purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of. . . . Second, Rule 9(b) exists to protect defendants from frivolous suits.  A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery.  Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Georgia, Inc.*, 755 F. Supp. 1055, 1056-57 (S.D. Ga. 1990).  "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).  "Rules 8(a) and

9(b) must be read in conjunction with one another.  [A] [p]laintiff may state allegations of fraud in short, plain statements, provided that said statements put [d]efendants on adequate notice of the conduct alleged to be fraudulent." *Reilly v. Charles M. Brewer, Ltd. Profit Sharing Plan*, No. CIV 02-2218-PHX-EHC, 2004 WL 7339615, at *4 (D. Ariz. Sep. 30, 2004).

### III.   ARS and ASD's motion to dismiss (Doc. 262)

#### A.  Judicial Notice

This is not the first time Counterclaim-Defendants have moved to dismiss Aetna's counterclaims.  Earlier in this litigation, Counterclaim-Defendants moved to dismiss Aetna's First Amended Counterclaim ("FACC").  Those motions were based, in part, on Counterclaim-Defendants' belief that Aetna had not been specific enough about the particular reimbursement claims it was challenging.  Before the Court could rule on those motions, Aetna produced in discovery a list of reimbursement claims that formed the basis of its counterclaims.  Aetna also moved for leave to file its SACC.  Counterclaim-Defendants agreed to stipulate to the filing of the SACC and withdraw their motions to dismiss the FACC on the understanding that the SACC's allegations were premised on the claims list Aetna produced during discovery, and on condition that Counterclaim-Defendants could move to the dismiss the SACC if they deemed such motions appropriate.  ARS and ASD now ask the Court to take judicial notice of Aetna's claims list and of ARS and ASD's statistical analysis of those claims.  They further ask the Court to take judicial notice of the Medicare Claims Processing Manual.  (Doc. 262-3.)  The Court grants this request in part.

Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  A document not appended to a complaint "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  The Court also can take judicial

- 6 -

notice of publicly available federal agency records that are not subject to reasonable dispute. *See U.S. ex rel. Modglin v. DJO Global Inc.*, 48 F. Supp. 3d 1362, 1384 (C.D. Cal. 2014). Here, the Court can consider Aetna's claims list because the claims identified therein form the basis of its counterclaims. The Court also can consider the Medicare Claims Processing Manual because it is a publicly available document produced by a federal agency, the content of which is not subject to reasonable dispute. The Court grants ARS and ASD's request to take judicial notice of these materials.

The Court denies ARS and ASD's request to take judicial notice of their statistical analysis of the claims Aetna is challenging. In the Court's judgment, this type of in-depth analysis crosses the line from merely summarizing the claims list to offering ARS and ASD's own version or interpretation of the facts, the latter of which is not appropriate at the motion to dismiss stage. Indeed, "[i]f defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). To the extent ARS and ASD's motion to dismiss is based on this statistical analysis, it is denied.[4]

**B. Recoupment of Overpayments under 29 U.S.C. § 1132(a)(3)**

In Counterclaim 11, Aetna seeks to recover alleged overpayments made to Counterclaim-Defendants pursuant to 29 U.S.C. § 1132(a)(3). ARS and ASD argue that Aetna's claim constitutes an adverse benefits determination and therefore must be dismissed because Aetna has not alleged that it exhausted its administrative remedies. The Court disagrees. Multiple district courts have determined that attempts to recover overpayments are not adverse benefits determinations subject to administrative exhaustion.

---

[4] In any event, ARS and ASD's statistical analysis of the claims identified by Aetna, even if credited, do not render Aetna's SACC implausible. This analysis reaches conclusions about "most" or "a majority" of the claims Aetna has identified, but not about all. At best, then, ARS and ASD's statistical analysis might undermine Aetna's allegations as to a subset of the claims at issue. That Aetna's counterclaims might later prove unsuccessful as to a subset of the challenged claims does not mean that Aetna cannot pursue its counterclaims at all.

*See, e.g., Connecticut Gen. Life Ins. Co. v. Elite Ctr. for Minimally Invasive Surgery LLC*, No. 4:16-CV-00571, 2017 WL 1807681, at *2 (S.D. Tex. May 5, 2017); *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 121 F. Supp. 3d 950, 985 (C.D. Cal. 2015); *Connecticut Gen. Life Ins. Co. v. True View Surgery Ctr. One, LP*, 128 F. Supp. 3d 501, 512 (D. Conn. 2015); *Nutrishare*, 2014 WL 1028351, at *3.

ARS and ASD alternatively argue that Counterclaim 11 must be dismissed because Aetna does not allege the specific plan terms that provide a basis for recoupment. The Court disagrees. Paragraph 318 of the SACC alleges that the plans authorize the recovery of overpayments where they "erroneously paid benefits because of false information entered on . . . [a] claim form or required documentation," and proceeds to identify a host of expenses and services allegedly not covered by the plans. These allegations are sufficient for pleading purposes. More granular details can be fleshed out through discovery. ARS and ASD's motion to dismiss Counterclaim 11 is denied.

### C. Fraud

To advance a fraud claim, Aetna must allege:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Peery v. Hansen*, 585 P.2d 574, 577 (Ariz. Ct. App. 1978). ARS and ASD raise a number of arguments as to why Aetna's fraud claim is not plausible. None are persuasive.

***High Prices***. ARS and ASD argue that Aetna cannot maintain a fraud claim based on the prices reflected in the OTCs' bills because high prices do not constitute fraud. Stated differently, ARS and ASD contend that the prices charged by the OTCs were not misrepresentations. The Court disagrees. The SACC does not merely allege that the OTCs charged high prices. The SACC instead alleges that the OTCs used grossly inflated rates supplied by ARS in place of their actual rates. Although ARS and ASD might disagree with Aetna's characterization of these high rates as being something other than the OTCs'

actual rates, the Court must accept Aetna's allegations as true for purposes of this order. Aetna has adequately alleged a misrepresentation based on the OTCs' use of grossly inflated rates supplied by ARS, untethered from the OTCs' actual rates.

Moreover, the authorities cited by ARS and ASD do not support their position. ARS and ASD cite *F.T.C. v. Magui Publishers, Inc.*, 9 F.3d 1551, 1993 WL 430102 (9th Cir. 1993) for the proposition that "mere setting of high prices may not constitute fraud," but they take this quote out of context. The full quote reads: "Magui argues that the district court erred in finding that it misrepresented the value of its prints, citing *United States v. Interstate Eng'g Corp.*, 288 F. Supp. 402, 422 (D. N.H. 1967) (Wyzanski, C.J.) for the principle that mere setting of high prices may not constitute fraud. However, the district court did not clearly err in finding that Magui's representations regarding the value of its prints contributed to the misrepresentation that the prints were valuable works of art." *Magui Publishers*, 1993 WL 430102, at *4. The Court did not hold that the mere setting of high prices may not constitute fraud; it made this statement in a portion of the decision summarizing the appellant's argument. And in any event, *Magui Publishers* was an appeal from a final judgment issued after a bench trial, not an appeal from an order granting a motion to dismiss. The case does not support dismissal of Aetna's fraud claim at the pleading stage.

Likewise, ARS and ASD cite *In re McGinty*, 276 B.R. 489, 497 (Bankr. N.D. Miss. 2000) for the proposition that charging inflated prices is not actionable fraud absent some misrepresentation, but *In re McGinty* was a decision issued after full trial on the merits, not at the pleading stage. Further, Aetna does not allege that ARS and ASD merely charged inflated prices. Aetna alleges that the OTCs, via their contracts with ARS and ASD, misrepresented their actual rates.

Finally, ARS and ASD cite *Jones v. Swanson Services Corp.*, No. CIV.A. 3:06-00002, 2009 WL 2151300, at *4 (M.D. Tenn. July 13, 2009) for the proposition that "conclusory allegation of high prices" are insufficient to state a claim for fraud. But far

from being conclusory, Aetna's allegations regarding the relationship between ARS, ASD, and OTCs, and Counterclaim-Defendants' pricing scheme are extraordinarily detailed.

**Reasonable Reliance on and Materiality of OTCs' Prices**.  ARS and ASD argue that Aetna cannot have reasonably relied on the OTCs' prices when determining reimbursement amounts because Aetna was never under any obligation to pay more than what it thought was reasonable.  Relatedly, they also argue that Aetna has not pled with sufficient specificity the claims for which the OTCs' billed prices impacted Aetna's reimbursement decisions, *i.e.*, materiality.  The Court disagrees.

ARS and ASD once again rely on two decisions rendered after trials on the merits. *See N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461 (5th Cir. 2018); *People v. Brigham*, 261 A.D. 2d 43 (N.Y. Ct. App. 1999).  Regardless of the merits of those decisions, they do not stand for the proposition that fraud claims like those being pursued by Aetna here cannot move past the pleading stage.  "Questions about materiality and reasonable reliance . . . usually are for the jury, not for the court to decide on a motion to dismiss."  *Lerner v. DMB Realty, LLC*, 322 P.3d 909, 914 (Ariz. Ct. App. 2014).  There will come a time when ARS and ASD can offer evidence to controvert Aetna's allegations. But at this stage, Aetna's allegations are entitled to a presumption of truth.  The SACC plausibly alleges that Aetna relied, at least in part, on the OTCs' billed charges when it determined how much (if any) to reimburse.  The SACC also identifies examples of claims that it would have paid differently had it known that the OTCs' bills did not reflect their actual rates.  Aetna's use of exemplars, rather than pleading the details of every disputed claim, does not render the SACC deficient.  To the contrary, Aetna's use of exemplars helps to harmonize Rule 8's command that a complaint be short, plain, and simple, with Rule 9(b)'s demand for more detail in cases of fraud.

**Waiver of Cost-Sharing.**  ARS and ASD argue that Aetna cannot plausibly allege fraud based on waiver of patients' cost-sharing obligations.  ARS and ASD's argument is two-fold.  First, they argue that Aetna's allegations are implausible because patients had no cost-share obligations in 80% of the challenged claims.  But this argument is based on

ARS and ASD's own statistical analysis and interpretation of the claims data, which the Court will not consider at the motion to dismiss stage.[5]  Second, ARS and ASD argue that an alleged failure to collect cost-share from patients does not amount to fraud absent a duty to disclose the cost-share waiver to the health plan.  For this proposition, ARS and ASD rely on *Connecticut General Life Insurance Co. v. Southwest Surgery Center, LLC*, 349 F. Supp. 3d 718, 731 (N.D. Ill. 2018), but that reliance is misplaced for two reasons: (1) the case addressed this issue in the context of a motion for summary judgment, not a motion to dismiss, and (2) the district court concluded that a fact dispute about whether the health plan's claims submission procedures required such disclosure precluded summary judgment.  ARS and ASD are moving to dismiss, not for summary judgment.  And paragraph 57 of the SACC alleges that Aetna's Copayment and Coinsurance Waivers Payment Policy prohibits both participating and non-participating providers from waiving copayment or coinsurance obligations.  The Court must accept that allegation as true for present purposes.

**Format of Provider's Bill.**  ARS and ASD argue that Aetna cannot state a fraud claim based on the OTCs' alleged misrepresentation of the "provider type" on their bills "because such a misrepresentation could not have been material to Aetna's payment decision, and Aetna could not have justifiably relied on it."  (Doc. 262-1 at 19.)  This argument is rejected because questions of materiality and reasonable reliance are questions of fact not suitable for resolution at the motion to dismiss stage.

ARS and ASD also argue that Aetna cannot plausibly allege that the OTCs knowingly misrepresented the provider type on their bills with the intent to defraud.  The Court disagrees.  The SACC contains sufficient factual matter to permit a reasonable inference of knowledge and fraudulent intent.  (*See, e.g*, Doc. 203-1 ¶ 7, 83, 100-114, 210.)

**D. Standing**

ARS and ASD argue that Aetna does not have standing to assert non-ERISA claims on behalf of the self-funded plans.  The Court previously has rejected this sort of argument.

---

[5] In any event, ARS and ASD's statistical analysis does not show that none of the challenged claims involved patient cost-share obligations.

*See Blue Cross of California Inc. v. Insys Therapeutics Inc.*, 390 F.Supp.3d 996, 1007 (D. Ariz. 2019) ("As for the self-funded plans, Insys argues that Anthem lacks standing because it neither suffered a financial injury nor has a valid assignment to bring the state law claims on behalf of the plans. . . . In support, Insys notes that, while Anthem provides administrative services for self-funded plans, it neither funds nor pays claims for these plans. . . . Although reimbursements on behalf of self-funded plans might not have been made from Anthem's fisc, Anthem still has a concrete and particularized interest in paying only valid claims to ensure its members' financial interests are protected." (internal quotations and citation omitted)).  To support their contrary view, ARS and ASD rely on *Almont*, in which the district court concluded that the administrator of self-funded plans lacked standing to bring claims under California's Unfair Competition Law ("UCL"), which has an economic injury component that "renders it more restrictive than federal injury in fact[.]" 121 F. Supp. 3d at 962.  But Aetna is not bringing a counterclaim under the UCL.  And even the *Almont* court later determined that the plan administrator had Article III standing to pursue other state law claims on behalf of self-funded plans.  *See Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, Case No.CV 14-03053 MWF(VBKx), 2015 WL 12778048, at * 20 (C.D. Cal. Oct. 23, 2015).

ARS and ASD also argue that Aetna's state law and non-ERISA claims seek damages that exceed the scope of Aetna's authority to recover overpayments.  But Aetna alleges that its Administrative Services Agreements give it broad authority to pursue recoveries on behalf of self-funded plans, and the Court must accept that as true for present purposes.

**E.  State and Federal RICO Claims**

To state a plausible RICO claim, Aetna must allege that ARS and ASD "participate[d] in (1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity[.]" *Eclectic Properties East, LLC v. Marcus*

& *Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014); 18 U.S.C. § 1962(c).[6]  ARS and ASD argue that Aetna has not plausibly alleged any of these elements.

*Racketeering Activity*.  Racketeering activity is defined by statute to include certain predicate offenses.  18 U.S.C. § 1961(1).  Aetna's RICO claim is based on the predicate offenses of mail fraud and wire fraud.  (Doc. 203-1 ¶ 265); 18 U.S.C. §§ 1341, 1343.  ARS and ASD argue that the SACC fails to adequately plead fraud of any kind, reiterating the arguments they made with respect to the SACC's common law fraud claim.  For reasons already explained, the Court finds the SACC adequately pleads fraud.

*Conduct of an Enterprise.*  The SACC alleges the existence of 9 separate association-in-fact enterprises, each consisting of ARS, ASD, and one of the remaining 9 OTCs.  (Doc. 203-1 ¶ 256.)  RICO defines enterprise broadly to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  "[A]n association-in-fact enterprise is . . . a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 944, 948 (2009).  However, "proof of a 'pattern of racketeering activity' is not, by itself, proof of an 'enterprise.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 549 (9th Cir. 2007) (internal citation omitted).  "The enterprise and its activity are two separate things," *Id.* at 551, and liability under RICO "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' and not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (emphasis in original).

ARS and ASD argue that the SACC does not plausibly allege that they conducted the affairs of an enterprise rather than acted in their own self interests.  ARS and ASD rely principally on two cases, *Connecticut General Life Insurance Co. v. Advanced Surgery Center of Bethesda, LLC*, No. DKC 14-2376, 2015 WL 4394408 (D. Md. July 16, 2015) and *Tri State Advanced Surgery Center, LLC v. Health Choice, LLC*, 112 F. Supp. 3d 809,

---

[6] Arizona courts have interpreted the state law version of RICO "to mirror the federal RICO statute." *Aviva USA Corp. v. Vazirani*, 632 Fed. App'x 885, 889 (9th Cir. 2015).  The Court therefore analyzes Aetna's federal RICO claim with the understanding that the same outcome will obtain under Arizona's analogous statute.

814 (D. Ark. 2015), which, when confronted with similar fraudulent billing allegations as those present here, concluded that the claimants had failed to plausibly allege that the billing scheme was part of an enterprise, rather than consistent with each entity carrying out its own business in a fraudulent manner.

This Court, however, is not persuaded by the analyses in *Connecticut General* and *Tri State*.  As the Third Circuit explained, "[i]t will often be the case that the interests of the enterprise are congruent with those of its members; such congruence presumably provides the incentive for members to participate in the enterprise."  *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 378 (3d. Cir. 2010).  As such, the fact that conduct may be consistent with each participant's own interests does not necessarily mean that the conduct cannot also plausibly reflect the affairs of an enterprise.  This Court finds persuasive the Third Circuit's view "that if defendants band together to commit [violations] they cannot accomplish alone . . . then they cumulatively are conducting the association-in-fact enterprise's affairs, and not [simply] their own affairs."  *Id.* (internal quotation and citation omitted; alterations in original).  Here, the SACC alleges that ARS and ASD banded together with each OTC to obtain reimbursement for exorbitant facility fees, an objective that they could not have accomplished alone.  For example, the SACC alleges that ASD generated referrals on behalf of the OTCs (Doc. 203-1 ¶¶ 76-82, 89-99), that ARS prepared agreements and sent follow-up letters to Aetna's members regarding the alleged cost-share waivers (*Id.* ¶¶ 122-137), and that the OTCs used artificial, grossly inflated rates provided by ARS, which the OTCs could not use outside their contracts with ARS (*Id.* ¶¶ 9, 10, 14, 72-74, 86, 115-121).  As alleged, these actions plausibly reveal conduct on behalf of each association-in-fact enterprise, notwithstanding the fact that the interests of the alleged enterprise might have been congruent with the interests of each member.

***Pattern of Racketeering Activity.***  Lastly, ARS and ASD argue that Aetna has not adequately pled a pattern of racketeering activity for each of the 9 alleged enterprises because a pattern of racketeering activity "requires at least two acts of racketeering

activity," 18 U.S.C. § 1961(5), and here Aetna's SACC alleged only one example of mail or wire fraud per OTC, and not all OTCs are included in the exemplars.  (Doc. 203-1 ¶¶ 154-169.)  On this score, ARS and ASD are correct.  Although Aetna need not allege every single instance of mail or wire fraud, to plead a pattern of racketeering activity it must allege at least two specific instances of mail or wire fraud per enterprise.  The Court therefore grants ARS and ASD's motion to dismiss the RICO claims from the SACC because Aetna has not adequately alleged a pattern of racketeering activity with respect to each of association-in-fact enterprise.

### F.  Summary

Although ARS and ASD purport to move for dismissal of all Aetna's counterclaims, their motion to dismiss fails to specifically address Aetna's tortious interference, civil conspiracy, aiding and abetting a tort, unjust enrichment, and money had and received claims.  The Court therefore does not comment on these claims in the context of ARS and ASD's motion to dismiss.  The Court denies ARS and ASD's motion to dismiss Aetna's fraud, negligent misrepresentation, and ERISA claims.  The Court grants ARS and ASD's motion to dismiss Aetna's state and federal RICO claims (Counts 5, 6, 7, and 8).

## IV.   Treatment Center OTCs' Motion to Dismiss (Doc. 274)

### A.  Fraud and Negligent Misrepresentation

The Treatment Center OTCs argue that the SACC fails to plead fraud and negligent misrepresentation with the requisite degree of particularity.  The Court disagrees.  "[A] complaint need not distinguish between defendants that had the exact same role in a fraud." *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018).  Here, Aetna accuses all of the remaining OTCs of playing essentially the same role in the alleged fraudulent scheme.  Aetna also pleads specific examples of allegedly fraudulent claims. (*See, e.g.*, Doc. 203-1 ¶¶ 155, 157, 163, 169.)   The Court is satisfied that the Treatment Center OTCs have been made aware of the circumstances for which they will have to prepare a defense, and that Aetna has sufficient pre-discovery evidence supporting its allegations.  Dismissal of these claims under Rule 9(b) is inappropriate.

The Treatment Center OTCs also argue that Aetna's fraud and misrepresentation claims fail because Aetna does not plausibly allege reliance on the information in the claims submitted to it by the Treatment Center OTCs.  For reasons already explained, however, questions about materiality and reasonable reliance generally are not properly resolved at the motion to dismiss stage.

### B.  Tortious Interference

"A prima facie case of intentional interference requires: (1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly." *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 31 (Ariz. 2002).  Here, Aetna accuses all Counterclaim-Defendants of tortiously interfering with its member benefit plans and provider contracts. With respect to the former, Aetna alleges that: (1) its member benefit plans contain provisions requiring members to satisfy their cost-sharing obligations; (2) Counterclaim-Defendants knew of the existence of these contracts and of the members' cost-sharing obligations under those contracts; (3) Counterclaim-Defendants interfered with these provisions by waiving or failing to collect the required patient cost-share; (4) these actions caused Aetna's members to breach the terms of their plans; and (5) Aetna was damaged because it made unnecessary payments to the OTCs as a result.  (Doc. 203-1 ¶¶ 170-182.)  As for the latter, Aetna alleges that: (1) Aetna's provider contracts typically require providers to refer to other in-network providers, except in certain limited situations, and to bill in a certain manner; (2) Counterclaim-Defendants knew about these contracts, yet induced in-network providers to refer patients to out-of-network providers and to perform services at out-of-network locations; and (3) as a result, Aetna made unnecessary payments to the OTCs.  (*Id.* ¶¶ 183-193.)

The Treatment Center OTCs argue that Aetna fails to plead the elements of this claim with the degree of particularity required by Rule 9(b).  But Rule 9(b) applies only to

averments of fraud.  It is not necessary for Aetna to plead every element of this claim with the type of specificity Rule 9(b) demands.  And, in any event, for reasons already discussed, Aetna's SACC satisfies Rule 9(b) by incorporating the claims list Aetna disclosed during discovery, identifying the Treatment Center OTCs' role in the overall scheme, and offering exemplar contract language.  The type of granularity the Treatment Center OTCs (and, frankly, all Counterclaim-Defendants) seem to be demanding at the pleading stage is not practical, productive, or helpful in a case of this magnitude.  The parties are aware of the universe of claims Aetna is challenging.  They know, then, that the relevant contracts are those that pertain to the patients for which those claims were submitted.  Aetna has adequately identified the role it believes the ARS, ASD, and the various OTCs played in the overall scheme.  This is more than adequate for the Treatment Center OTCs to respond and prepare a defense.

Aside from a misguided Rule 9(b) argument, the Treatment Center OTCs argue that the SACC does not adequately allege that they knew about the substance—as opposed to the mere existence—of the relevant agreements.  The Court disagrees.  For starters, even under Rule 9(b), knowledge, intent, and other conditions of the mind may be pled generally.  Further, for pleading purposes, one can reasonably infer that if the Treatment Center OTCs knew that these contracts existed, they also were aware of the cost-sharing and in-network referral obligations that those contracts allegedly imposed.  Aetna need not use magic words in its SACC to survive dismissal.

The Treatment Center OTCs also argue that the SACC is deficient because it summarizes the relevant provisions of the plans but does not identify the precise language in the plans that prohibit patient cost-sharing.  Again, the Court disagrees. Aetna's summaries of relevant plan language are adequate to put the Treatment Center OTCs on notice of the claims being asserted against them.  Moreover, Aetna has disclosed a list of the precise claims it is challenging.  Through discovery, the parties can identify with more specificity the precise language of each corresponding plan.  But it would undermine Rule 8(a) to require Aetna to identify in its SACC the precise language for each and every plan.

### C. Civil Conspiracy and Aiding and Abetting

The Treatment Center OTCs argue that Aetna's civil conspiracy and aiding and abetting claims fail for lack of an underlying tort. But, as previously explained, the SACC adequately alleges fraud, misrepresentation, and tortious interference claims. Therefore, Aetna's civil conspiracy and aiding and abetting claims are tethered to underlying torts.

The Treatment Center OTCs also argue that Aetna's aiding and abetting claim fails because, as pled, it does not identify which Counterclaim-Defendants were the primary and which were the secondary tortfeasors. The Court agrees with Aetna that, at bottom, this is a "magic words" argument. The SACC does not need to contain the magic words "primary tortfeasors" and "secondary tortfeasors" in order to state a plausible aiding and abetting claim.

### D. ERISA

The Treatment Center OTCs argue that Aetna fails to adequately plead a claim under 29 U.S.C. § 1132(a)(3) because the SACC does not identify the plans at issue, nor does it identify the precise terms of those plans that it seeks to enforce. The Court disagrees. Given the number of disputed claims, it would not be practical or productive for Aetna to include in its SACC the precise language for every single plan. Instead, the SACC pleads what it alleges to be materially representative plan language. And Aetna has provided a list of the disputed claims to the Treatment Center OTCs through discovery. This information is adequate to put the Treatment Center OTCs on notice of the plan language that Aetna seeks to enforce.

### E. Unjust Enrichment and Money Had and Received

The Treatment Center OTCs argue that Aetna's unjust enrichment and money had and received claims are inadequately pled because Aetna fails to allege facts demonstrating that it was impoverished by making payments to the Treatment Center OTCs, or that it is entitled to recover any money paid to the Treatment Center OTCs. This argument strikes the Court as bizarre—the entire thrust of Aetna's SACC is that due to the allegedly tortious actions of the Counterclaim-Defendants, it paid (or overpaid) claims to the OTCs that it

would not otherwise have paid.  The Court rejects the Treatment Center OTCs' argument on this point.

Alternatively, the Treatment Center OTCs argue that these claims fail at least as they pertain to the self-funded plans because the money paid from those plans does not belong to Aetna.  The Court disagrees.  Aetna alleges that is serves as a fiduciary for the self-funded plans at issue.  "[T]rustees may indisputably litigate claims and collect overpayments on behalf of the trust—or in this case, plan sponsors—even though they do not 'own' the money they seek to collect."  *Almont*, 2015 WL 12778048, at *21.

**F.  Standing**

Lastly, the Treatment Center OTCs argue that Aetna lacks standing to assert state-law claims on behalf of the self-funded plans.  The Court has already rejected this argument in the context of ARS and ASD's motion to dismiss.

**G.  Summary**

The Treatment Center OTCs' motion to dismiss is denied.

**V.    Pain Center OTCs' Motion to Dismiss (Doc. 284)**

The Pain Center OTCs' challenge Aetna's fraud, misrepresentation, tortious interference, civil conspiracy, aiding and abetting, unjust enrichment, and money had and received claims, and also challenges Aetna's standing to bring its ERISA claim.  But the Pain Center OTCs' motion relies on essentially the same arguments the Court has rejected in the preceding pages of this order.  The Court needs not reiterate its analysis of these claims.  Suffice it to say that nothing in the Pain Center OTCs' motion changes the Court's analysis of the sufficiency of Aetna's SACC.  The Pain Center OTCs' motion to dismiss is denied.

**VI.    Aetna's Motion for Leave to Amend (Doc. 437)**

After the parties briefed the various motions to dismiss Aetna's SACC, Aetna moved for leave to file a Third Amended Counterclaim ("TACC").  (Doc. 437.)  Aetna filed its motion within the current scheduling order's deadline for amending pleadings.  It seeks to add additional counterclaims and parties based on information Aetna has learned

through discovery, to shore up its existing claims with additional information learned through discovery, to correct the entities listed as Counterclaim-Defendants, and to otherwise conform the pleading to the evidence

"The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Court then assesses the propriety of the motion for leave to amend by considering factors such as bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the complaint previously has been amended. *See Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990). "Generally, this determination should be performed with all inferences in favor of granting the motion." *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999).

The Court does not find that Aetna is pursuing its motion in bad faith. The Counterclaim-Defendants argue that Aetna's motion comes too late and that granting the request would be prejudicial because it would require them to re-brief their motions to dismiss. The Court disagrees. The Court's ruling on the pending motions to dismiss moots Counterclaim-Defendants' second concern. And Aetna's motion is not too late; it was filed within the deadline for amending pleadings and in response to new information unearthed in discovery. Moreover, the Court has set a supplemental scheduling conference to modify the current case management deadlines, meaning the parties will have an opportunity to adjust the case schedule to accommodate the new allegations.

With that said, the Court has its own concerns about Aetna's proposed TACC. These concerns relate to circumstances that have changed since the filing of Aetna's motion for leave to amend. First, Aetna's proposed TACC includes certain OTCs that have since settled. Second, this order finds that Aetna's SACC fails to allege a pattern of racketeering activity as to ARS and ASD. Aetna did not have the benefit of this Court's order when it drafted its proposed TACC. In light of these changed circumstances, the Court grants Aetna's motion for leave to amend, but will give Aetna 10 days from the date of this order in which to file its amended pleading. This additional time will allow Aetna to make any adjustments to its proposed TACC that might be necessitated by recent developments. If

Aetna makes any such adjustments, it shall file, concurrent with the TACC, an updated redlined version that apprises the Court and all parties of the changes.

**IT IS ORDERED** as follows:

1. ARS and ASD's motion to dismiss (Doc. 262) is **GRANTED IN PART** and **DENIED IN PART** as explained herein.

2. The Treatment Center OTCs' motion to dismiss (Doc. 274) is **DENIED**.

3. The Pain Center OTCs' motion to dismiss (Doc. 284) is **DENIED**.

4. Aetna's motion for leave to amend (Doc. 437) is **GRANTED**.  Aetna shall file its TACC within **10 days** of the date of this order.

Dated this 25th day of March, 2022.

Douglas L. Rayes
United States District Judge